703 F.2d 127
 Sheldon ENGEL, Fred Hervey, Richard G. Miller and Curgie W.
Pratt, Plaintiffs- Appellees,
v.
TELEPROMPTER CORPORATION, Teleprompter Cable Services, Inc.
and Westinghouse Electric Corporation,
Defendants-Appellants.
 No. 82-1045.
 United States Court of Appeals,
Fifth Circuit.
 April 18, 1983.
Rehearing Denied May 24, 1983.
 
 Thomas A. Seaton, Oakland, Cal., Jerry R. Prothro, Midland, Tex., Jack W. Thomson, James J. Coleman, Sr., New Orleans, La., Harold R. Farrow, Oakland, Cal., for defendants-appellants.
 W. Dean Hester, Malcolm Harris, El Paso, Tex., for plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Texas.
 Before JOHNSON, WILLIAMS and JOLLY, Circuit Judges.
 E. GRADY JOLLY, Circuit Judge:
 
 
 1
 This diversity action involves the right-of-first-refusal clause in a stock transfer restriction which was part of the stock subscription agreement for the purchase of El Paso Cablevision, Inc. (El Paso) common stock. Parties to the agreement included the four plaintiffs, four other non-party individuals, and one of the corporate defendants. The four plaintiffs are minority shareholders of El Paso stock. The three corporate defendants include Teleprompter Cable Services, Inc., (TCSI), the majority shareholder of El Paso stock, Teleprompter Corporation (Teleprompter), TCSI's parent corporation, and Westinghouse Electric Corporation (Westinghouse) whose wholly owned subsidiary owned 100 percent of the Teleprompter stock.
 
 
 2
 The court below found that the merger of Teleprompter and Westinghouse's second-tier subsidiary constituted "an other disposition" of the El Paso stock owned by Teleprompter's subsidiary, TCSI. The court enjoined the corporate defendants to honor the first-refusal option by giving the plaintiffs the right to purchase the El Paso stock at a price reflecting the pro rata cost to Westinghouse of purchasing the Teleprompter stock. Finding that the court has clearly misapplied the law to the facts, we reverse.
 
 I.
 
 3
 In 1967 the City of El Paso, Texas, noticed an intention to franchise a cable television system for the city. Jack Kent Cooke (Cooke) and Jack Kent Cooke, Inc., (Cooke, Inc.) subsequently expressed an interest in obtaining a franchise for installation of the system. Wishing to obtain local ownership in the corporation to operate such a system, Cooke and Cooke, Inc., decided to form the El Paso Corporation with plaintiffs and three other non-party individuals, all El Paso and Tucson, Arizona, businessmen. On September 29, 1967, the seven individuals and Cooke, Inc., entered a stock-subscription agreement for the purchase of 100 percent of El Paso common stock at $10 per share. The plaintiffs purchased 17 1/3 shares of El Paso, Cooke purchased 70 shares, and three other individuals obtained the remaining 12 2/3 shares. The agreement obligated the majority shareholder, Cooke, to provide all funds, personnel and services to finance the installation and operation of the cable television system. Cooke was to be repaid with interest before any distribution was made to the minority shareholders.
 
 
 4
 Paragraph 8 of the Subscription Agreement, at issue here, stated as follows:
 
 
 5
 All shares of stock shall be subject to further restriction that in the event that any of the stockholders propose to sell or otherwise dispose of all or any part of his shares after 18 months from date of issue, said stockholder shall sign and deliver to the other stockholders a written notice stating as follows: That he has received a bona fide offer of purchase of a designated number of his shares of the corporation; that he proposes to accept said offer; the name and address of the real party in interest making such offer; the price per share; and the terms of payment, and the other remaining stockholders on a pro rata basis shall have the prior right for twenty (20) days thereafter to purchase such shares on such terms.
 
 
 6
 Notwithstanding the foregoing, Cooke and Company shall have the right at any time to sell, assign or otherwise transfer all or any portion of their stock free and clear from any restriction imposed by this Paragraph 8 to Jack Kent Cooke or any member of his family, to Directors, Officers or key employees of Company, to Directors, Officers or key employees of other companies in which Cooke owns a majority of the outstanding stock and to any company in which Cooke owns a majority of the outstanding stock. In the event of such transfer, the transferee shall have the right at any time to sell or assign any portion of his stock of Cablevision to any person, persons, or companies in the aforementioned categories free and clear from any restriction imposed by this Paragraph 8. However, the provision of this paragraph 8 shall continue to be applicable to the sale, assignment or transfer of any stock of Cablevision to any person, persons or companies not within the aforementioned categories. (Emphasis added.)
 
 
 7
 Within the eighteen-month period after the formation of the corporation, and thus exempt from the stock transfer restriction, Cooke transferred 4 of his 70 shares to plaintiff, Richard Miller, and one of the non-party individuals transferred his 4 2/3 of El Paso to Cooke, Inc. On December 24, 1969, twenty-four months after the effective date of the transfer restriction, Cooke transferred his remaining 66 shares in El Paso to Cooke, Inc., thus divesting himself of personal ownership of any El Paso stock. Two years later, Cooke, Inc., exercising its right of first refusal, acquired another four shares of El Paso stock from another non-party individual. As of August 1971, the plaintiffs owned 21 1/3 shares of El Paso stock, and Cooke, Inc., owned 74 2/3 shares. That ownership continues to date.
 
 
 8
 On October 21, 1968, before Cooke, Inc., acquired any shares of El Paso stock, Cooke sold all of his shares in Cooke, Inc., to H & B American Corporation (H & B) in return for 33 1/3% of the outstanding shares of H & B. Cooke, Inc., thus became H & B's wholly owned subsidiary. Two years later, on September 17, 1970, H & B merged with defendant, Teleprompter. Teleprompter was the surviving corporation, and Cooke, Inc., became a wholly owned subsidiary of Teleprompter. One year later, Cooke, Inc.'s, name was changed to TCSI with all of the El Paso stock registered to and voted by TCSI.
 
 
 9
 In 1975, two of the plaintiffs, Pratt and Engel, threatened to sue Teleprompter[1] if it failed to purchase their El Paso shares. Four years later the same two plaintiffs filed a derivative action against El Paso, Cooke, Cooke, Inc. (TCSI), Teleprompter, the two other plaintiffs, and various other present and former El Paso officers. Teleprompter and Cooke, Inc., were never served, and Cooke was later dismissed from the suit because, as the court found, he had sold his El Paso shares in 1969, had owned no shares since 1969, was never an El Paso officer and had left the El Paso Board of Directors in 1975. He thus had no connection with El Paso and could not be held liable in a derivative action.
 
 
 10
 During the pendency of the derivative action, Cooke negotiated an agreement to sell his Teleprompter stock to a Westinghouse subsidiary as part of the proposed merger of the Westinghouse subsidiary and Teleprompter. The proposed merger and Cooke's part therein were reported on the front page of the October 20, 1980, edition of the Wall Street Journal and duly noted by plaintiff Engel. One month later, Westinghouse and Teleprompter executed a merger agreement by which a wholly owned Westinghouse subsidiary was to purchase all of Teleprompter's outstanding stock, the subsidiary would merge into Teleprompter, and Teleprompter would survive the merger.[2] Teleprompter's shareholders approved the Westinghouse-Teleprompter merger on April 2, 1981. Six weeks later, the pending derivative action was resolved in a consent decree. The defendants in the action waived their claim for attorney's fees in exchange for Pratt's and Engel's agreement not to bring another action based on events occurring prior to May 29, 1981.
 
 
 11
 Two months later the plaintiffs to this lawsuit (Engel) demanded that Teleprompter and Westinghouse comply with the right of first refusal in the El Paso stock-transfer restriction. One week later, on July 30, 1981, the FCC approved Westinghouse's application to acquire Teleprompter's outstanding stock.
 
 
 12
 The next day, the plaintiffs filed the instant action, requesting an injunction to halt the sale of any shares of Teleprompter, TCSI, or El Paso. An ex parte temporary restraining order issued, effectively prohibiting the Teleprompter-Westinghouse merger. A hearing was held on the plaintiffs' Motion for a Temporary Injunction on August 5, 1981, at which time the plaintiffs argued that Westinghouse would acquire ownership and control of El Paso if the merger was consumated, and that they had potential purchasers for 100 percent of the El Paso stock. At the hearing, however, the plaintiffs' counsel conceded that rather than seeking to enjoin the merger, the request for an injunction was to keep the El Paso stock in limbo. This request was granted, and the Westinghouse subsidiary merged into Teleprompter, with Teleprompter surviving and itself becoming a subsidiary of Westinghouse.
 
 
 13
 After a bench trial on the merits three months later, the district court concluded that: "After the merger, JACK KENT COOKE (or any exempt transferee of the Cooke shares under Paragraph 8 of the Subscription Agreement) no longer owns or controls any shares of EL PASO CABLEVISION, INC." The court thus found that the merger between Teleprompter and Westinghouse's second-tier subsidiary amounted to "an other disposition" of the 74 2/3 shares of El Paso stock within the meaning of the stock transfer restriction. Accordingly, the court enjoined the corporate defendants to honor the first-refusal option of the El Paso stock subscription agreement by giving the plaintiffs the right to purchase the El Paso stock at a price reflecting Westinghouse's pro rata cost of purchasing the Teleprompter stock. The corporate defendants filed a timely appeal.
 
 II.
 
 14
 The corporate defendants (denominated Teleprompter) have raised six arguments on appeal to support reversal of the district court's ruling below.[3] Our disposition of this case, however, does not require us to reach each of Teleprompter's arguments. As we view the case, the sole question that we need to decide is whether there was a transfer, sale, assignment, or other disposition in July 1981 of El Paso stock to a non-exempt transferee. In other words, did the merger of the Westinghouse subsidiary with Teleprompter constitute a sale, transfer, assignment, or other disposition of the stock owned by Teleprompter's subsidiary, TCSI?
 
 A.
 
 15
 The district court characterized H & B's acquisition of the Cooke, Inc., (TCSI) stock as a merger in one instance and Cooke, Inc., as a wholly owned subsidiary of H & B in another. The terms "merger" and "stock acquisition," however, have two entirely different legal connotations.
 
 
 16
 A merger of two corporations contemplates that one corporation will be absorbed by the other and will cease to exist while the absorbing corporation remains. United States v. Philadelphia National Bank, 374 U.S. 321, 331 n. 7, 83 S.Ct. 1715, 1724 n. 7, 10 L.Ed.2d 915 (1963); Kemos, Inc. v. Bader, 545 F.2d 913, 915 (5th Cir.1977). A subsidiary corporation, on the other hand, is a legal entity separate and apart from its shareholders, notwithstanding the fact that its principal shareholder is another corporation. International City Bank and Trust Co. v. Morgan Walton Properties, Inc., 675 F.2d 666, 669 (5th Cir.1982).
 
 
 17
 In a merger, both the assets and liabilities of the disappearing corporation are vested in the surviving corporation. PPG Industries, Inc. v. Guardian Industries Corp., 597 F.2d 1090, 1096 (6th Cir.1979); Vulcan Materials Co. v. United States, 446 F.2d 690, 694 (5th Cir.1971). A purchase of stock in a corporation, however, does not constitute the purchase of the corporate assets, just as a transfer of the stock of a corporation is not a transfer of the property and assets of the corporation itself. United States v. Niarchos, 125 F.Supp. 214, 228 (D.D.C.1954); Department of Transportation v. PSC Resources, Inc., 419 A.2d 1151, 1154, 175 N.J.Super. 447 (1980); Glazer v. Cambridge Industries, 281 Pa.Super. 621, 422 A.2d 642, 644 (Pa.Super.1980); McClory v. Schneider, 51 S.W.2d 738, 741-42 (Tex.Civ.App.1932).
 
 
 18
 A detailed analysis of the nature of the transactions involving the El Paso stock is thus crucial to a resolution of this case. Under Texas law, shares of corporate stock are personal property. Griffin v. Jones, 518 S.W.2d 435, 437 (Tex.Civ.App.1974). The El Paso stock thus constituted a personal asset in the hands of its owners.
 
 
 19
 When H & B purchased the Cooke, Inc., stock from Cooke in October 1968, Cooke, Inc., became a wholly owned subsidiary of H & B. The transaction did not constitute a merger where Cooke, Inc., was absorbed by H & B and where H & B succeeded to all of Cooke, Inc.'s, privileges, powers, rights, and duties. Rather, Cooke, Inc., became H & B's wholly owned subsidiary, a separate legal entity possessing its own separate assets and liabilities.
 
 
 20
 One year later, when Cooke, Inc., acquired the El Paso stock, that stock became the asset of the subsidiary, not that of the parent, since a corporation's acquisition of an asset does not constitute an acquisition by the corporate shareholders absent some actual or bookkeeping transfer of the asset from one entity to the other. City of Woodway, Texas v. United States, 681 F.2d 975, 980 (5th Cir.1982). There was no such transfer here.[4]
 
 
 21
 The next pertinent transaction was H & B's merger with Teleprompter in September 1970. At the time of the merger, H & B wholly owned and operated seventy-three cable television systems throughout the United States; Teleprompter owned or had a substantial interest in another twenty-four systems. Teleprompter, as the surviving corporation, acquired ownership of H & B's assets, including the Cooke, Inc., stock. El Paso, however, was not among the enumerated cable systems owned by H & B according to the merger document. Cooke, Inc., was merely noted as a subsidiary of H & B; the El Paso stock was not mentioned. Although ownership of the Cooke, Inc., stock passed to Teleprompter in the merger, ownership of the El Paso stock remained with Cooke, Inc., which became a wholly owned subsidiary of Teleprompter and which later changed its name to TCSI.
 
 
 22
 The final transaction relevant to this case was the merger of Teleprompter with a Westinghouse subsidiary in July 1981. Teleprompter, as the surviving corporation, retained all of its previous assets. The record shows specifically that the Westinghouse subsidiary-Teleprompter merger did not involve the sale of any of Teleprompter's assets. As the surviving corporation, Teleprompter continued to own the Cooke, Inc., (TCSI) stock, and TCSI continued to own the 74 2/3 shares of El Paso stock. The record thus supports a conclusion that the El Paso stock is now, and has been since December 1969, owned by Cooke, Inc., (TCSI).
 
 B.
 
 23
 We next must determine the exempt or non-exempt status of the parties to the transactions. We would note at the outset that our reading of the stock transfer restriction itself requires the following conclusions:
 
 
 24
 1) those transactions exempt under the agreement were any sale, transfer or assignment of El Paso stock by Cooke or Cooke, Inc., (TCSI) to Cooke; Cooke family members; directors, officers, or key employees of Cooke, Inc., (TCSI); any company in which Cooke owned a majority of the outstanding stock or that company's directors, officers, or key employees;
 
 
 25
 2) the transfer restriction applied to an exempt transferee, enumerated above, should it decide to sell, assign or transfer any of its El Paso stock to someone other than another exempt transferee.
 
 
 26
 Applying the facts of this case to the stock transfer restriction, it would appear that the right of first refusal attached when Cooke transferred his 66 shares of El Paso stock to Cooke, Inc., (TCSI) in December 1969.[5] At that time Cooke owned no stock in Cooke, Inc., a wholly owned subsidiary of H & B, nor did his ownership of 33 1/3% of the outstanding shares of H & B constitute a majority ownership of Cooke, Inc.'s, parent.
 
 
 27
 At the preliminary injunction hearing, Engel's counsel stated that Cooke, Inc., is "exempt regardless of who owns it or when they own it and so forth ...." On appeal, however, Engel concedes that Cooke's ownership of Cooke, Inc., through ownership of H & B was "eighteen percentage points short of the ownership percentage literally required of the contract" to qualify as an exempt transferee.[6] The district court nonetheless categorized Cooke, Inc., as an exempt transferee by reading the stock transfer restriction as exempting "transfers at any time by and among Jack Kent Cooke and Cooke, Inc....."[7]
 
 
 28
 We are thus faced with the fact that Cooke, Inc., (TCSI), the owner of El Paso's 74 2/3 shares of stock, has been a wholly owned subsidiary of another company since its acquisition by H & B in October 1968. From the record we also note that Cooke has never owned a majority position in any of Cooke, Inc.'s parent corporations. It is thus difficult to determine from the court's finding why Cooke, Inc.'s, status as an exempt transferee in December 1969, when it was a wholly owned subsidiary of H & B, is any different from its status as a wholly owned subsidiary of Westinghouse's subsidiary in December 1981 when the judge made his findings of fact.
 
 
 29
 The district court found that after the merger of Teleprompter, TCSI's parent, and the Westinghouse subsidiary, "Jack Kent Cooke or any exempt transferee of the Cooke shares under paragraph 8 ...." no longer owned or controlled any shares of El Paso.[8] Without any definition of "controls," we think this same statement would be equally applicable to December 1969 when Cooke transferred his El Paso shares to Cooke, Inc., a wholly owned subsidiary of H & B.
 
 
 30
 The court below further found that all of the El Paso shares in question were registered to and voted by TCSI, formerly Cooke, Inc., on the one hand, but its legal support for finding that the Teleprompter-Westinghouse subsidiary merger amounted to an "other disposition" of the 74 2/3 shares of El Paso was a 1979 Tenth Circuit case which defined "other disposition" as any transaction "in which the individual in question passes on ownership to someone or some entity." Debry v. Transamerica Corp., 601 F.2d 480, 493 (10th Cir.1979) (emphasis added). The holding in that case, hinging on a transfer of ownership as it obviously does, is clearly distinguishable from the instant case.
 
 
 31
 Since Cooke, Inc., (TCSI) has owned the El Paso shares since December 1969, and since the court below found that Cooke, Inc., was an exempt transferee, implicit in the court's holding that no exempt transferee now owns or controls[9] the El Paso shares is a finding that someone other than the exempt transferee, TCSI, now owns the El Paso stock. With this finding we cannot agree.
 
 
 32
 The district court's findings fail to conclude who in its opinion now owns the El Paso stock in question; the findings simply state who does not own the stock. Engel, however, claims, as it did below, that Westinghouse owns 100% of the El Paso stock formerly owned by Cooke, through its wholly owned subsidiaries. To find that Westinghouse now owns the El Paso stock would be to disregard totally the separate corporate existence of two legitimate Westinghouse subsidiaries, Teleprompter Corp. and TCSI.[10]
 
 
 33
 A parent corporation possesses a separate existence and is treated separately from a subsidiary unless there are circumstances justifying disregard of the corporate entity. Chrome Plate, Inc. v. District Director of Internal Revenue, 614 F.2d 990, 996 (5th Cir.1980). Here we have been presented absolutely no circumstances, factual, legal, or equitable which would require us to disregard the separate legal existence of the two subsidiaries in question. The mere fact that a wholly owned subsidiary of Westinghouse owned 100% of the stock of Teleprompter which owns 100% of TCSI stock does not justify the conclusion that Westinghouse is the owner of the assets of its third-tier subsidiary, TCSI. Walker v. Newgent, 583 F.2d 163, 167 (5th Cir.1978). As we have stated earlier, ownership of the stock of a corporation is not synonymous with ownership of the corporate assets.
 
 
 34
 In the absence of justifiable grounds for disregarding the separate legal existences of Westinghouse, Teleprompter and TCSI, we adhere to our conclusion that TCSI owns the El Paso stock in question and that there has been no sale, transfer, assignment or other disposition since the initial transfer of the Cooke shares of El Paso to Cooke, Inc., (TCSI) in December 1969. Concisely stated, transfer of the stock of a parent corporation does not affect the ownership of assets held by a subsidiary.
 
 C.
 
 35
 Engel finally alleges that allowing Cooke to sell his shares in the transferee corporation (without specifying who the transferee corporation is), without complying with the first-refusal option would nullify the rights of the minority shareholders.
 
 
 36
 Under Texas law, however, stock transfer restrictions are not favored and are to be strictly construed. Earthman's, Inc. v. Earthman, 526 S.W.2d 192, 202 (Tex.Civ.App.1975). To give the plain words of the agreement the interpretation that Engel now urges would be contrary to this Texas principle.[11] Neither law nor equity favors our reading into the stock transfer restriction words which the parties to the agreement themselves did not write. Abilene Savings Association v. Westchester Fire Insurance Co., 461 F.2d 557, 561 (5th Cir.1972); Phillips Petroleum Co. v. Gillman, 593 S.W.2d 152, 154 (Tex.Civ.App.1980).
 
 
 37
 El Paso's minority shareholders have the same rights and privileges today that they acquired in 1967. Ownership of the majority shares of El Paso remains with Cooke, Inc., (TCSI), one of the original parties to the stock subscription agreement. The fact that ownership of Cooke, Inc., has changed is irrelevant to the question of ownership of the El Paso stock in question. The El Paso stock subscription agreement restricted transactions in El Paso stock alone; it did not restrict transactions in the stock of any other corporation.
 
 III.
 
 38
 After a careful reading of the stock transfer restriction agreement in question and a detailed analysis of the facts and the law applicable to the facts, we find that the district court has clearly misinterpreted the subscription agreement by its implicit finding that the right of first refusal was triggered merely by a transfer of the control of the El Paso stock rather than a transfer of the ownership of the stock. The court furthermore has misapprehended the legal consequences attaching to the ownership of the assets of a corporation when 100% of its stock is acquired by another corporation. Thus by the misinterpretation of the agreement and by a misapplication of the law to the facts of this case, the court has erred in its conclusions. For these reasons, we reverse for dismissal of the complaint and entry of judgment for the defendants.
 
 
 39
 REVERSED.
 
 
 40
 JERRE S. WILLIAMS, Circuit Judge, concurring specially:
 
 
 41
 I concur. The holding and the opinion of the Court effectively reduce a complicated series of business transactions to their critical elements. I wish, however, to place brief emphasis upon certain aspects of our decision.
 
 
 42
 It deserves emphasis that the only critical transaction in this case is the 1981 merger under which Teleprompter became the wholly owned subsidiary of Group W which in turn is a wholly owned subsidiary of Westinghouse. All of the relevant aspects of this entire corporate history of El Paso Cablevision Corp. and the controlling Paragraph 8 of its Stock Subscription Agreement are to be evaluated solely on the basis of that 1981 merger and the situation which prevailed when it took place.
 
 
 43
 It was at this time that Jack Kent Cooke for the first time sold out his large financial interest in Teleprompter. Plaintiffs claim, with some support in the record, that as Chairman of the Board of Teleprompter and its largest shareholder, Cooke could well have been in functioning control of Teleprompter, and in turn, therefore, of El Paso Cablevision. It was this event, then, that led the district court to conclude that something of legal significance had happened because Cooke, the original incorporator of El Paso Cablevision, for the first time bowed out of the picture of having a substantial interest in that corporation through ownership of shares in Teleprompter. Thus, while I agree with the conclusion of the Court, I do not agree that the district court was as overtly incorrect as the majority opinion tends to imply. The withdrawal of Jack Kent Cooke from serving, as a practical matter, as a significant influence on El Paso Cablevision from its inception until the sale of his shares in Teleprompter in 1981 raised critical questions to be resolved by the interpretation of the Paragraph 8 first refusal agreement.
 
 
 44
 The opinion of the Court speculates upon whether the 1969 transaction of Jack Kent Cooke's transfer of his sixty-six shares of El Paso stock to Cooke Inc. was an exempt transfer or not. The opinion concludes that there was no clear error in the district court finding that this was an internal or exempt transaction under Paragraph 8.
 
 
 45
 I would not engage even in this much speculative evaluation. It is obvious that all of the parties treated the transaction as an internal transaction under Paragraph 8, and the corporation's stock transfer records note that the transfer was one authorized by that paragraph without first refusal.
 
 
 46
 I would place full emphasis upon the fact that the Court in finding that the conclusion of the district court was not clearly erroneous settles once and for all any issue concerning the 1969 transaction. It was an exempt transaction under Paragraph 8. This, in turn, leads to the critical implications of the current status of the parties. I agree that the El Paso Cablevision's stock has never been "sold or otherwise disposed of" within the meaning of Paragraph 8 of the Subscription Agreement since 1969, and that was an exempt transfer. The stock continued, therefore, as a block of stock never sold or otherwise transferred when the parent companies owning it engaged in corporate mergers three different times.
 
 
 47
 The final conclusion must be that after this decision the El Paso shares are still subject to Paragraph 8 of the Subscription Agreement. They may not be sold or otherwise transferred (converted into some other kind of shares or asset) by Teleprompter, the subsidiary of Group W, the subsidiary of Westinghouse, without granting the first refusal rights to plaintiff stockholders. I would not concur in the holding of the Court if this continuing right were not recognized. To find that it has been lost, somehow, because Jack Kent Cooke sold his shares in Teleprompter in 1981 would be a conclusion that something had happened by way of sale or other disposition of the El Paso Cablevision shares at some time since 1969 which ended the first refusal restriction. Paragraph 8 contains no provision which would do this.
 
 
 48
 Appellant Teleprompter stresses strongly that the investment of the plaintiffs in El Paso Cablevision was very small, and it now is very valuable. The majority opinion makes some reference to this situation. I find it of no relevance at all unless we were engaging in an equitable balancing under a determination to pierce a corporate veil. We properly do not do so. We should not leave an implicit conclusion, however, that the plaintiffs are not entitled to any serious consideration of their legal rights because they invested so little in this company at the beginning. It is clear from this record that the major original investor in El Paso Cablevision, Jack Kent Cooke, realized a huge profit when Teleprompter bought him out. Teleprompter is hardly in a position to buy out Jack Kent Cooke, giving him the full return on his profitable investment in El Paso Cablevision, but then insist that the other stockholders are being unfair and unreasonable when they claim the full benefit of their investment, which included the right of first refusal of any non-exempt sale of El Paso Cablevision's stock. That restriction properly continues. But with no sale or other disposition of the El Paso Cablevision shares having been shown to have taken place in 1981, the plaintiff stockholders had no right at that time to exercise first refusal rights under Paragraph 8 of the Stock Subscription Agreement.
 
 
 
 [1]
 The nature of this suit is not ascertainable from the correspondence between Pratt's and Engel's attorney and Teleprompter which simply referred to a resort to the "various remedies at our disposal." One month earlier, however, the same attorney, on behalf of Pratt and Engel, had threatened El Paso's officers with a derivative action, absent compliance with certain demands including a certified copy of the corporate books and the implementation of certain new innovations relating to the cable system
 
 
 [2]
 Pursuant to the merger agreement a wholly owned subsidiary of Westinghouse's wholly owned subsidiary Westinghouse Broadcasting Company (Group W) merged into Teleprompter, with Teleprompter as the surviving corporation. Teleprompter thus became a wholly owned subsidiary of Group W which in turn is a wholly owned subsidiary of Westinghouse. For purposes of simplification, the transaction is denominated a merger between a Westinghouse subsidiary and Teleprompter, or the Westinghouse-Teleprompter merger
 
 
 [3]
 Teleprompter argues on appeal that:
 a) the May 29, 1981, consent decree in the derivative action between Pratt and Engel and El Paso, TCSI, and two of the current plaintiffs, bars the appellee's claim under the doctrine of res judicata;
 b) the district judge gave an impermissibly broad interpretation to the subscription agreement;
 c) the judge erred if he pierced the corporate veil to hold that Westinghouse now owns the El Paso stock in question;
 d) the doctrine of laches bars appellees' claim since appellees waited nine months after actual knowledge of the planned sale of Cooke's Teleprompter stock and the proposed Westinghouse subsidiary-Teleprompter merger to file suit;
 e) even if a disposition in El Paso stock occurred, the trial court erred in its remedy;
 f) the judge's wholesale adoption of the appellee's proposed findings and his failure to make detailed findings may require a holding that the findings were clearly erroneous.
 
 
 [4]
 Cooke's transfer of the El Paso stock to Cooke, Inc., was not veiled in secrecy. On the contrary, pursuant to the city's franchise agreement with El Paso, the city council was required to grant approval prior to any transfer of more than thirty percent ownership or control of El Paso stock. Pursuant to this agreement, El Paso, through its attorney and director, W.C. Peticolas, sought approval from the city council for Cooke's proposed transfer. The request letter noted that the transferee, Cooke, Inc., was a wholly owned subsidiary of H & B and that Cooke owned thirty-three percent of H & B's outstanding stock. The city council gave its approval December 18, 1969 and the transfer took place six days later. We note that the request letter stated that Cooke proposed to transfer his original 70 shares of El Paso to Cooke, Inc. This is at variance with the district judge's finding that Cooke transferred to Cooke, Inc., the 66 shares of El Paso that he then owned. A resolution of this disparity, however, is not necessary for purposes of this opinion
 
 
 [5]
 See infra note 7
 
 
 [6]
 Engel contends that none of the plaintiffs had knowledge of the Cooke--Cooke, Inc., transfer and that the burden was clearly on Cooke to notify the other shareholders that he proposed to transfer shares to a non-exempt transferee, a burden he never carried. We note, however, that the plaintiffs' own evidence shows that plaintiff Hervey was president of El Paso at the time the transfer took place and that plaintiff Miller was vice president of the corporation. As indicated in note 2, supra, the corporation was required to obtain city council approval prior to the transfer. That request included the fact that Cooke owned less than a majority position in Cooke, Inc.'s, parent, H & B, information which Engel says the plaintiffs were not privy to
 Moreover, the corporation's stock transfer record notes that the Cooke--Cooke, Inc., transfer was authorized by paragraph 8 of the subscription agreement.
 
 
 [7]
 While the subscription agreement lends itself to an interpretation that Cooke and Cooke, Inc., were to be treated as one and thus the 1969 transfer of stock from Cooke to Cooke, Inc., was not covered by the agreement, we find this an unnecessary consideration because of the manner in which we ultimately dispose of the case. For this reason, we do not base our ruling here on any intimation that this finding by the court was clearly erroneous
 If the 1969 transfer was in fact a transfer to a non-exempt party contemplated by the stock restriction, the plaintiffs are confronted with a severe, if not insurmountable, issue of laches. Our disposition of the case makes it unnecessary to resolve the problems presented by the 1969 transfer by Cooke to Cooke, Inc. Suffice it to say, from 1969 to date, Cooke, Inc., (TCSI) has owned the El Paso stock formerly owned by Cooke.
 
 
 [8]
 Engel contends that "[i]t was not until the Westinghouse merger transaction of 1981 that Jack Kent Cooke divorced himself from effective ownership and control of El Paso Cablevision, Inc." We find, however, that the stock transfer restriction makes no mention of either "effective ownership" or "controls." As noted, supra, Cooke "divorced himself" of ownership of the El Paso stock twelve years prior to the instant suit. According to the district judge and the corporate records (and as Engel argued below), that transfer was exempt under paragraph 8
 The subscription agreement does not require Cooke to retain an ownership interest in the transferee (Cooke, Inc.). The only restriction on the transferee Cooke, Inc., (TCSI) is that should it, (not Cooke) decide to sell, transfer or assign its shares of El Paso stock to someone other than an exempt transferee, it must abide by the first-refusal requirements. We have found no such sale, transfer or assignment.
 We further observe that the only mention of the word "control" (as opposed to the "majority ownership" requirement in paragraph 8) in the documents in evidence is in the city's franchise agreement with El Paso. See supra note 2. That agreement required city approval prior to the transfer of more than thirty percent of the right of control of the El Paso stock. The franchise agreement, however, is not part of the stock subscription agreement nor should it be read together therewith.
 
 
 [9]
 As noted supra note 8, we can find no support in the stock subscription agreement for a finding that control, as opposed to ownership, of the El Paso stock is relevant to any transaction in the stock
 
 
 [10]
 Since, as noted supra note 1, Teleprompter is a wholly owned subsidiary of Group W, a wholly owned subsidiary of Westinghouse, our remarks here are equally applicable to Group W. Group W is not a party to this suit nor is it mentioned in the briefs of the parties. We thus direct our comments throughout to the two subsidiary parties, Teleprompter and TCSI
 
 
 [11]
 We find no equitable reason to so interpret the agreement. The plaintiffs have, as far as the record shows, invested a total of $10 a share, or $243.33, in the corporation. Teleprompter and TCSI, on the other hand, assumed the financial obligations incumbent on Jack Kent Cooke as the original majority shareholder. At the time of the litigation below, Teleprompter and its subsidiary had invested in excess of $29,000,000 to construct the El Paso cable system
 The plaintiffs, individually or in concert, have run hot and cold toward Teleprompter during the existence of the corporation. In October 1970 plaintiff Engel notified Teleprompter vice-president Robert H. Symons, that he was reassured to learn that Teleprompter had allocated funds to construct the El Paso cable system and that the corporation had accepted all of the responsibilities of Cooke, Inc., and H & B in protecting the El Paso franchise "for all the stockholders." Engel further sought a working relationship with Teleprompter in a proposed Arizona cablevision system.
 Five years later Pratt and Engel requested that Teleprompter buy out their interests in El Paso or be faced with legal action. At the same time the El Paso board of directors, which included plaintiffs Hervey and Miller, provided Pratt and Engel with certain corporate records including copies of all recorded stock transfers in an effort to resolve this dispute.
 In October 1979 Pratt and Engel instituted a derivative action against El Paso, Teleprompter, TCSI, and various present and former El Paso officers. The actions against Teleprompter and TCSI, who had not been served, were dismissed with prejudice for want of prosecution; the claims against the other defendants were dismissed with prejudice in May 1981 after the parties stipulated that there was no evidence of wrongdoing on the part of any defendant.
 Undaunted, Engel and Pratt joined forces with two El Paso officers, Hervey and Miller, in the instant suit. On July 23, 1981, after noting that the FCC was scheduled to approve the Westinghouse subsidiary-Teleprompter merger within one week, the plaintiffs notified the current defendants that the first-refusal option requirements had not been met, and failure to abide by the stock transfer restriction would result in a lawsuit. One day after the FCC's approval of the merger, the instant suit was filed.
 The evidence in the record below shows that the minority shareholders were intimately involved in the affairs of the corporation, contrary to the picture painted by Engel here and below. Plaintiff Hervey served as president of the corporation until he resigned in 1973 to run for Mayor of El Paso. In 1975 he was reinstituted as chairman of the board of the corporation. Plaintiff Miller served as vice-president of the corporation from its inception. All of the plaintiffs were aware of the 1969 Cooke--Cooke, Inc., stock transfer. Hervey and Miller were aware of Cooke's percentage ownership in H & B at the time of the transfer. The corporate records show that the 74 2/3 shares of El Paso, at all times here relevant, were owned by TCSI, and all correspondence from Teleprompter so indicated.