**DOCUDATA RECORDS MANAGEMENT SERVICES, INC., Appellant,**

v.

**Keith WIESER, Appellee.**

**No. 01–96–00341–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

March 26, 1998.

Kent J. Pagel, Houston, for appellant.

Allen Craig Eiland, T. Bryan Akin, III, Houston, for appellee.

Before WILSON, ANDELL and HUTSON–DUNN,[1] JJ.

---

1. The Honorable D. Camille Hutson–Dunn, retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

## OPINION

ANDELL, Justice.

This appeal presents two interrelated questions of first impression concerning the circumstances under which a corporation may be considered "sold." The first issue is whether the transfer of "control" of a parent corporation from one shareholder group to another corporate entity constitutes a sale of one of the parent corporation's wholly-owned subsidiaries. The second issue is whether the merger of a wholly-owned subsidiary into the parent corporation, pursuant to the terms of a share exchange agreement involving the parent corporation, constitutes a sale of the subsidiary.

### Factual Summary

In April 1988, Richard Moen and Donald Hoff started a company called Lawyers Reproduction Services, Inc. The company engaged in copying, document imaging services, and facilities management for law firms. By January 1993, Lawyers Reproduction Services, Inc. was a holding company for eight subsidiaries operating litigation support services in at least three states. At this time, the corporation changed its name to LRS Group, Inc. (LRS). Moen, Hoff, and Moen's children's trust (collectively the LRS shareholders) owned 100% of LRS's stock. LRS, in turn, owned 100% of the stock in each of its subsidiaries.

Sometime in March or April 1992, Steve Sulgrove, an LRS sales manager, introduced appellee, Keith Wieser, to Moen, Hoff, and Stan Smith, LRS's vice-president of finance. Wieser attempted to persuade LRS to invest in medical records retrieval, a litigation service in which medical records are gathered through subpoena for use in trial. Wieser had been in the records retrieval business for about 10 years, in both California and Texas, and had recently attempted to form his own records retrieval company. Moen, Hoff, and Smith were interested in Wieser's proposal, and entered into negotiations. Moen and Hoff proposed that LRS would form a wholly-owned subsidiary called Docudata Records Management Services, Inc. (Docudata), through which Wieser would operate the

medical records retrieval business. Moen and Hoff expected Wieser to use his expertise in the business to begin LRS's infant records retrieval business and to develop it into a viable and profitable business segment for LRS. They offered to make Wieser a vice-president in charge of Docudata. His duties would include the hiring and training of new employees and the marketing of the new service.

At some time during the negotiations, Moen and Hoff indicated that LRS planned to develop Docudata to a point where it could be taken public or sold. Wieser whose expertise in the records retrieval business would be important in starting up Docudata, was concerned he might lose his investment in time and effort as soon as the business became successful. Originally, he requested an ownership interest in Docudata. However, Moen and Hoff did not want him to be a stock holder in one of LRS's subsidiaries. Instead, they offered Wieser a bonus package to protect his interest in his "sweat" equity. This provision stated:

> For the period through December 31, 1995 should [Docudata] be sold [Wieser] shall receive an additional bonus of the "net sales price" . . . on a tiered basis. . . .

> Net sales price is defined as gross sales price less all applicable commissions, fees, and expenses directly related to the sales [sic] of DocuData.

Wieser agreed to this compromise and signed an employment contract with Docudata on May 5, 1992. This contract also supplemented the above bonus provision by granting Wieser participation in a proposed stock option plan that LRS anticipated installing after 1995.

Wieser's employment with Docudata and LRS—especially his relationship with Hoff—was turbulent. In early 1993, an LRS employee informed Wieser that he would have to consent to new employment terms. Wieser signed a new employment contract on February 1, 1993. Under this contract, Wieser received commissions based on net profit, rather than on sales as his original employment contract had provided. Wieser testified that this change in terms significantly reduced his compensation. Hoff testi-

fied, through deposition, that Wieser constantly complained about his compensation. He testified that he and Moen attempted to satisfy Wieser's complaints with several raises during Wieser's tenure. Wieser's new employment contract included a similar bonus provision to the one included in the original employment contract. However, the new provision added that "[t]he sale of this company, the evaluation of the sales price and the terms of the sale will be at the sole discretion of the shareholders."

LRS experienced dramatic growth from 1988 through 1992. However, it did not have sufficient capital to fund this growth. In early 1993, Moen and Hoff began negotiations with several venture capital firms. The Sprout Group (Sprout) expressed an interest in investing in LRS. Moen and Hoff also expressed an interest in Sprout. Originally, Sprout merely wanted to infuse LRS with capital. Later that spring, it presented a new plan to Moen and Hoff in which LRS would combine its business operations with a corporation wholly-owned by another corporation in which Sprout had a substantial investment. Sprout, Moen, and Hoff anticipated that this "marriage" would provide both companies with a broader client base and more economies of scale. Moen and Hoff liked this plan and began negotiations with Sprout to put the deal together.

Sprout owned an overwhelming majority of the common stock and of a preferred class of stock of Compex Services, Inc. (big Compex), a California corporation. Big Compex, in turn, owned 100% of the stock of Compex Systems, Inc. (little Compex). Little Compex was involved in the medical documents retrieval business in both California and Texas. As part of its deal with Sprout, the LRS shareholders entered into a share exchange agreement with big Compex on June 21, 1993, in which a new holding company, Comdoc Services, Inc. (Comdoc), was formed. This agreement required the LRS shareholders to transfer 100% of their LRS stock to Comdoc in exchange for 1,575,000 shares of Comdoc common stock and 1,925,000 shares of Comdoc Series A preferred stock. These shares were divided among the shareholders in proportion to their ownership of LRS. Big Compex transferred 100% of its little Compex stock to Comdoc in exchange for 6,500,000 shares of Comdoc Series B preferred stock. Both the common stock and the Series B preferred stock contained voting and dividend rights, while the Series A preferred stock contained neither. As a result of this exchange, the former LRS shareholders and big Compex became the sole shareholders in Comdoc, LRS and little Compex became wholly-owned subsidiaries of Comdoc, and Docudata became a second tier subsidiary of Comdoc. However, LRS remained Docudata's sole shareholder.

Also as part of this exchange agreement, Moen and Hoff became officers of Comdoc at greatly increased salaries. Moen became Comdoc's chief executive officer, and Hoff became a senior vice-president. Both Moen and Hoff also received incentive stock options. In addition, the exchange agreement required big Compex to offer up to a two million dollar loan to either little Compex or LRS to help fund their capital needs. The exchange agreement required that the loan recipient pay the loan back as soon as bank financing could be obtained. To facilitate Comdoc's ability to obtain bank financing, the agreement required that LRS merge all eight of its subsidiaries into itself within 90 days from the date that the agreement took effect. Smith testified that this provision made LRS more attractive as a borrower by pooling all its assets in a single corporate entity. This merger occurred sometime in November 1993.

After the exchange, big Compex owned more than 80% of Comdoc's vote and value for income tax purposes. Wieser's expert witness, Alan Westheimer, testified that the transaction was tailored this way to enable big Compex to include Comdoc on its consolidated income tax return. Big Compex controlled Comdoc after the exchange. According to Westheimer, the former LRS shareholders' preferred class of Comdoc stock was valuable only if big Compex converted its preferred shares to common stock, Comdoc made a public offering of its stock, or Comdoc was otherwise sold. Otherwise, this stock did not entitle the LRS shareholders to any increased management

rights in Comdoc or to a share in its distributed profits. Finally, after the exchange, big Compex held three places on Comdoc's board of directors; Moen and Hoff occupied the remaining two directorships.

During the LRS shareholders' negotiations with Sprout, Wieser became privy to the fact that Moen and Hoff were considering some sort of deal with big Compex. Wieser had worked for big Compex in California and Texas. He thought that the big Compex management was less than upright in their business dealings and addressed his concerns to Moen and Hoff. Later, after the exchange agreement took effect, Wieser received a memo from big Compex's CEO stating that LRS was now affiliated with big Compex. Wieser became very upset with the new arrangement and confronted Hoff about his future at Docudata. Weiser testified that Hoff informed him that Weiser would become a vice-president of marketing for Docudata in charge of all of LRS's divisions including the document retrieval business. Wieser viewed this new arrangement as a demotion. Smith, on the other hand, testified that Moen and Hoff intended that Wieser manage the Texas document retrieval operations for both LRS and little Compex.

Wieser testified that he felt Moen and Hoff had sold Docudata to big Compex as part of the exchange agreement. He discussed this concern with them soon after the exchange agreement took effect. He further stated that Moen and Hoff told him that he was not entitled to his bonus and that he was warned not to spend any money "on that ghost."

Soon after the exchange agreement took effect, Docudata began moving its business operation to little Compex's offices in Houston. Weiser testified that all of Docudata's assets were transferred to this new location. Smith testified that because Docudata needed more space and because little Compex recently had signed a long-term lease at its location, Comdoc management decided to move Docudata to the little Compex location. Furthermore, he testified that Docudata bought little Compex's Texas record retrieval business. Docudata reflected this business on its financial statements, and little Compex

received an intercompany loan as consideration.

In June 1993, a professional search firm contacted Wieser about a job opportunity with Ridgeway's, Inc.'s litigation support division. Ridgeway's interviewed Wieser several times over the next several months. On September 20, 1993, Wieser tendered his resignation to LRS. Within a few days, he began working for Ridgeway's in legal services.

On October 5, 1993, LRS and Docudata sued Wieser for breach of a noncompete agreement that was part of his second employment agreement with LRS. Wieser counterclaimed alleging that LRS and Docudata had breached his contract by not paying his bonus based on Docudata's sale to big Compex. After a bench trial, the court found that Wieser had not breached any noncompete agreement. Furthermore, the court found that LRS and Docudata had breached the bonus provision of Wieser's employment contract. The court entered a modified final judgment awarding Wieser $135,051 in damages, pre- and post-judgment interest, and attorney's fees. Docudata appeals this judgment.

## Discussion

In its first point of error, Docudata asserts that the evidence was legally and factually insufficient to support the trial court's implied finding that Docudata had been sold. Because this question may be decided on legal sufficiency grounds, we need not consider Docudata's factual sufficiency argument. When addressing a "no evidence" point of error, this Court may consider only the evidence that tends to support the jury's findings and must disregard all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Harris County Appraisal Dist. v. Wilkerson*, 911 S.W.2d 84, 86 (Tex.App.—Houston [1st Dist.] 1995, writ denied). If more than a scintilla of evidence exists to support the questioned finding, the "no evidence" point must fail. *Herbert v. Greater Gulf Coast Enters.*, 915 S.W.2d 866, 872 (Tex.App.—Houston [1st Dist.] 1995, no writ).

Wieser asserts that the share exchange between big Compex and the LRS share-

holders constituted a sale of Docudata. He bases this assertion on the fact that ultimate control over Docudata shifted, as a result of the exchange, to big Compex through its majority ownership of Comdoc. As Wieser's reasoning goes, big Compex controlled the ultimate direction of Docudata and could determine the future disposition of its assets. Wieser also bases his claim on the fact that LRS merged its eight subsidiaries, including Docudata, into itself. As a result, according to Weiser, all Docudata's assets shifted to its parent. Presumably, Docudata ceased to exist after this merger.[2] See TEX. BUS. CORP. ACT ANN. art. 5.06(A)(1) (Vernon Supp. 1998) (stating that when a merger takes effect, "the separate existence of every domestic corporation that is a party to the merger, except any surviving or new domestic corporation, shall cease."). Wieser asserts that the results of the exchange constitute a sale both because of the common understanding of the word "sale" and because of the intentions of the parties to his employment contract. He asserts that any other interpretation would deny him the benefit of his bargain.

 A purchase of stock in a corporation does not constitute a purchase of the corporate assets. *Tenneco, Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 645 (Tex. 1996) (citing *McClory v. Schneider*, 51 S.W.2d 738, 741 (Tex.Civ.App.—Amarillo 1932, writ dism'd)); *see also Engel v. Teleprompter Corp.*, 703 F.2d 127, 134 (5th Cir. 1983). 'Similarly, a sale of all the stock in a corporation does not constitute a sale of the corporation's assets. *Tenneco, Inc.*,' 925 S.W.2d at 645.

 In *Engel*, the Fifth Circuit confronted the issue whether the merger of a Westinghouse subsidiary with cable-TV company Teleprompter constituted a sale, transfer, assignment, or other disposition of the stock held by Teleprompter's subsidiary. *Engel*, 703 F.2d at 130. The court held the merger did not involve the sale of any Teleprompter assets. *Id.* at 134. Teleprompter, as the surviving corporation, continued to own Cooke, Inc. (TCSI) stock and TCSI contin-

ued to own El Paso shares. *Id.* at 132. The merger between a parent company and a subsidiary of another company does not affect the legal status of the assets, including subsidiaries, of the surviving parent company.

 Moreover, a parent corporation and its subsidiaries are distinct legal entities. *Pulaski Bank & Trust Co. v. Texas Am. Bank, N.A.*, 759 S.W.2d 723, 731 (Tex.App.— Dallas 1988, writ denied) ("Under Texas law, the separate identity of corporations will be observed by the courts, even in instances where one may dominate or control the other, or may even treat it as a mere department, instrumentality or agency of the other."); *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 337–38 (Tex.1968); *see also Capital Parks, Inc. v. Southeastern Adver. & Sales Sys., Inc.*, 30 F.3d 627, 629 (5th Cir.1994) (holding that a wholly-owned subsidiary was "a separate legal entity possessing its own separate assets and liabilities"). A parent company and its subsidiary maintain their independence even though the same persons are directors or managers of both corporations, *Lucas v. Texas Indus.*, 696 S.W.2d 372, 376 (Tex.1984) (citing *State v. Swift*, 187 S.W.2d 127 (Tex.Civ.App.—Austin 1945, writ ref'd)), or even though most or all the capital stock of a subsidiary corporation is owned by its parent corporation. *Rimes v. Club Corp.*, 542 S.W.2d 909, 911 (Tex.Civ.App.—Dallas 1976, writ ref'd n.r.e.). Regardless of stock ownership or interlocking directorship, courts will not ignore the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs, such as violation of anti-trust laws, protect fraud, or defend crime. *Norton v. Integral Corp.*, 584 S.W.2d 932, 934–35 (Tex.Civ.App.—Austin 1979, no writ); *Engel*, 703 F.2d at 134. Based on these basic corporate fundamentals, the transfer or sale of a parent corporation's (LRS) stock does not constitute a sale of its subsidiary (Docudata). Furthermore, the record does not indicate, nor does Weiser assert, the merger between LRS and Compex Services was designed to injure the public or circumvent the law.

---

**2.** Docudata is the only plaintiff-counterdefendant to appeal in this case.

Even if the stock exchange involved in this case could be considered a sale of LRS, it did not effectuate a sale of Docudata. Immediately after the exchange, LRS continued to own 100% of Docudata's stock. As such, Docudata's ownership remained unaffected. Wieser urges this Court to look behind these corporate formalities and look at what actually happened. He asserts that because the exchange shifted control away from the LRS shareholders to big Compex, a sale, as it is commonly understood, occurred. However, the issue of control is not dispositive. *Engel,* 703 F.2d at 135 (holding that control of stock, as opposed to ownership in the company, was not enough to invoke rights of first refusal); *Capital Parks,* 30 F.3d at 629. Wieser's argument requires this Court to ignore both Docudata's and LRS's independent corporate existences. Before the exchange, LRS owned Docudata. After the exchange, it continued to own Docudata. LRS did not transfer Docudata's stock to any purchaser; nor did it sell Docudata's assets. Throughout this exchange, neither big Compex nor Comdoc ever gained ownership of Docudata's stock or assets. In the absence of any justifiable grounds for disregarding the separate legal existences of LRS and Docudata, this Court will not do so.

In urging the Court to look past the formalities and toward the underlying nature of the transaction, Weiser relies upon the rationale adopted by this Court in *Galveston Terminals, Inc. v. Tenneco Oil Co.,* 904 S.W.2d 787, 791 (Tex.App.—Houston [1st Dist.] 1995, *writ granted w.r.m.,* 922 S.W.2d 549 (Tex.1996)) (concluding that the financial arrangements viewed as a whole illustrate a transaction that, in a round-about way, accomplished just what a direct sale would have). The Texas Supreme Court, however, expressly rejected this reasoning in *Tenneco. Tenneco,* 925 S.W.2d at 646. Sound corporate jurisprudence requires courts to narrowly construe rights of first refusal and *other provisions* that effectively restrict the free transfer of stock. *Id.; Engel,* 703 F.2d at 134. To view otherwise would compromise the law's unfavorable estimation of such restrictive provisions. *Tenneco,* 925 S.W.2d at 646. Because we determine the stock transaction between LRS and big Compex to be legitimate and one not affecting the assets of LRS, and heeding the principle respecting the free transfer of stock, we conclude no such sale of Docudata occured.

Wieser also asserts that the merger of Docudata with LRS, if such a merger occurred in actuality, constituted proof that Docudata was sold. Based on the principles of *Tenneco, Engel,* and *Capital Parks,* such a merger could never constitute a sale of Docudata's assets to Comdoc or big Compex. Big Compex, at best, owned Comdoc. In a like manner, Comdoc, at best, owned LRS and little Compex. However, Comdoc did not own LRS's assets. After the merger of LRS and Docudata, LRS assumed ownership of Docudata's assets, and Docudata, theoretically, disappeared. *Engel,* 703 F.2d at 131; TEX. BUS. CORP. ACT ANN. art 5.06(A)(2) (Vernon Supp.1998).

This state of affairs leads to the question of whether the merger of a wholly-owned subsidiary with its parent constitutes a sale of the subsidiary. A sale is defined as a transaction "between two parties, called, respectively, the 'seller' (or vendor) and the 'buyer' (or purchaser), by which the former, in consideration of the payment or promise of payment of a certain price in money transfers to the latter the title and the possession of property." BLACK'S LAW DICTIONARY 1337 (6th ed.1990). Though mergers are usually described with the parlance of sale, *see Shannon v. Samuel Langston Co.,* 379 F.Supp. 797, 801 (W.D.Mich.1974) ("A merger contemplates the absorption of the acquired corporation's operations by the acquirer, and the practically contemporaneous dissolution of the acquired corporation as a legal entity."), the merger of a wholly-owned corporation into its parent does not fit the typical sale mold. The purchaser and the seller are the same entity, the parent corporation, and no consideration passes. We hold that the merger of a wholly-owned subsidiary with its parent does not constitute a sale of the subsidiary. Such a transaction is simply a restructuring in the corporate form of the subsidiary's business.

We conclude that Docudata was not sold because its ownership remained with LRS

throughout the period in which the exchange took place. Therefore, we sustain Docudata's first point of error on legal sufficiency grounds. We need not address the remainder of that point of error or Docudata's other points of error.

We reverse and render judgment that the appellee take nothing from Docudata.