NICOLAS M. SALGO ASSOCIATES,
Plaintiff,

v.

CONTINENTAL ILLINOIS PROPER-
TIES and Pan American Properties,
Inc., Defendants.

Civ. A. No. 81–1427.

United States District Court,
District of Columbia.

Oct. 14, 1981.

Edmund R. Learned, Learned & Jordan, Wichita, Kan., Sidney Dickstein, John T. Kotelly, Michael E. Nannes, Dickstein, Shapiro & Morin, Washington, D. C., for plaintiff.

Alfred H. Moses, David J. Cynamon, Charles D. Stodghill, Covington & Burling, Washington, D. C., for defendants.

## MEMORANDUM

FLANNERY, District Judge.

This matter is before the court on plaintiff's motion for summary judgment. Plaintiff asserts that there are no material facts at issue and that this case merely presents the court with the simple legal issue of whether a change in corporate organization by the defendants constituted a violation of an "Anti-Assignment" provision of the parties' Partnership Agreement.

*Facts*

The dispute in this case concerns the appropriate interpretation of the terms of the AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP OF WATERGATE IMPROVEMENT ASSOCIATES (hereinafter referred to as "Partnership Agreement"). Watergate Improvement Associates (hereinafter "WIA") owns and manages substantial amounts of valuable property in the District of Columbia. The general partners in WIA at the time of the incidents at issue were Nicolas M. Salgo Associates (hereinafter "NMSA") and Continental Illinois Properties (hereinafter "CIP"). Although CIP provided almost all of the original capital contribution, $9 million compared to $500,000.00, NMSA possessed a wealth of experience and expertise in dealing with the purchased property and, as a result, each general partner was given a 50 percent interest in WIA.

The parties' partnership in WIA was formed by a Partnership Agreement dated November 2, 1977. This agreement records in great detail each partner's rights and obligations concerning the partnership. This case involves a dispute as to the meaning of one section of that agreement, Section 21.0, which provides:

> Except as herein expressly permitted, no Partner shall sell, assign, pledge, hypothecate or otherwise encumber or dispose of all or any part of its interest in this Partnership (including any beneficial interest therein), except by will or by operation of law on death, *without the prior written consent of both General Partners, which consent may be withheld for any reason whatsoever*; provided, however, should a limited partner of NMSA desire to assign a portion of his limited partnership interest to a key employee of any person involved with the operation of the Property, CIP agrees that it shall not unreasonably withhold its consent to such assignment.

(Emphasis supplied). Another section of the agreement, Section 22.9, provides the non-defaulting partner with default remedies in the event of a violation of Section 21.0. In this case, plaintiff NMSA asserts that CIP violated Section 21.0 by transferring its Partnership Interest in WIA to defendant Pan American Properties, Inc. (hereinafter "PAP") without securing the required prior written consent of NMSA and that it is therefore entitled to the default remedies provided by Section 22.9.

The alleged transfer of Partnership Interest occurred in the following manner. First, on June 7, 1979, Bouverie Properties, Inc. (hereinafter "Bouverie") announced a tender offer to acquire any and all of the outstanding common stock of CIP.[1] As a consequence of that offer, Bouverie gained effective control of CIP and on July 18, 1979, Bouverie replaced a majority of the trustees of CIP.[2] Second, on or about Octo-

---

1. Bouverie had incorporated in Delaware just two days prior to announcing its tender offer.

2. At this point the trustees changed CIP's name to Pan American Properties, an entity distinct from the corporation which survived the merg-

ber 14, 1980, the trustees of CIP entered into an agreement with Bouverie to merge CIP into Bouverie and to name the surviving entity Pan American Properties, Inc. This merger was effected on January 15, 1981.[3] At no time prior to the merger did CIP seek NMSA's written consent to this plan of action. Defendants did seek NMSA's approval after the fact in a letter of February 24, 1981, *see* plaintiff's exhibit 4, attachment 4, page 3, but NMSA decided to withhold its approval.

*Discussion*

■ I. Before deciding whether the instant actions of CIP and PAP actually amounted to a transfer of interests, this court is faced with the preliminary issue of whether the disputed section of the parties' contract even applies to a mere transfer of interest. The defendants argue that since the actual term "transfer" is not employed in Section 21.0, it is obvious that the section's prohibitions were not meant to apply to a transfer of interest, as compared to an "assignment" or a "disposition" of interests. Further, the defendants claim that the fact that the term "transfer" is employed in the heading of Section 21.0 is without legal significance because Section 29.0 of the agreement provides that all headings are for convenience only and are not to be considered as part of the agreement. Although defendants' argument possesses some superficial attractiveness, it fails to take account of the principle that the parts of a contract are not to be interpreted or construed in isolation, but instead this court must construe the contract as a whole. *Washington Metropolitan Area Transit Authority v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C.Cir.1980).

Plaintiff, on the other hand, convincingly argues that interpreting the contract as a whole, Section 21.0's prohibitions clearly in-

clude a transfer of interests. This argument is based upon two other sections of the agreement which utilize the term "transfer" in apparent reference to the prohibitions of Section 21.0.[4] First, Section 21.3 states "no assignment *or transfer* of any part of the interest of any Partner [shall be valid until a duplicate copy] ... has been delivered to the Partnership." (Emphasis supplied.) Similarly, and more directly, Section 22.9 characterizes an Event of Default as "a *transfer* of any Partnership Interest, direct or indirect, *as prohibited by Section 21* hereof." (Emphasis supplied.) The use of the term "transfer" in these other sections, especially the direct reference to Section 21.0 in Section 22.9, requires the interpretation that a transfer of interest was indeed intended to be within Section 21.0's prohibitions.

II. In an alternative attempt at vindication, defendants maintain that even if this court interprets Section 21.0 to prohibit a mere transfer of interest, this prohibition was never intended to apply to the specific type of transfer at issue here. In support of this contention the defendants offer parol evidence of certain additional understandings alleged to have been reached by the parties during the negotiation of the Partnership Agreement. This evidence is in the form of sworn statements contained in the affidavits of two officers of the defendant corporation. For the following reasons, however, this evidence is clearly inadmissible for the purposes for which defendant proffers it.

■ First, the parties' Partnership Agreement purports to be the complete integration of the contract between the parties. "All prior partnership agreements and any amendments or supplements thereto are hereby superseded and revoked. *The agreements hereinafter set forth shall con-*

---

er and was named Pan American Properties, Inc. For ease of reference the entity which was originally CIP will be referred to as CIP throughout this memorandum.

3. At the time of the merger Bouverie owned approximately 97.8 percent of the interests in CIP.

4. Plaintiff also maintains that the term "transfer" is included definitionally in the term "assignment," which is actually used in Section 21.0.

stitute the sole and only Partnership Agreement between the Partners." Partnership Agreement, Recital C (emphasis supplied). As a result, under District of Columbia law, the agreement is presumed to be the complete contract between the parties. *See Rothenberg v. Aero Mayflower Transit Co.*, 495 F.Supp. 399, 404 (D.D.C.1980).

■ Second, because the agreement is presumed to be the complete integration of the parties' contract, parol evidence is only admissible if the agreement is ambiguous or if it was executed through fraud, duress or mistake. *See Shankland v. Mayor*, 5 Pet 390, 30 U.S. 930, 8 L.Ed. 166 (1831); *Rice v. Rice*, 415 A.2d 1378, 1382 (D.C.Ct.App.1980). Because the written language of the instant Partnership Agreement is susceptible of a clear and definite understanding, and neither fraud, duress, nor mistake is alleged, admission of the proffered parol evidence in this case would be improper. *See Reynolds v. Reynolds*, 415 A.2d 535, 537 (D.C.Ct.App. 1980).

III. Finding that the scope of Section 21.0 does include transfers of interest and having no competent evidence to except the instant transfer from the parties' intended prohibitions, the next issue, and the key one, is whether a merger by operation of law constitutes a transfer of interest for the purposes of Section 21.0. This is apparently a question of first impression for this circuit and although there is a dearth of relevant caselaw from other areas,[5] two distinct lines of thought emerge.

The first line of thought is evidenced by the Sixth Circuit's decision in *PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090 (6th Cir.), *cert. denied*, 444 U.S. 930, 100 S.Ct. 272, 62 L.Ed.2d 187 (1979) (hereinafter "PPG"). In *PPG*, the survivor of a merger argued that it had succeeded to certain licensing rights previously owned by the merged corporation despite the fact that the original licensing agreement expressly made those rights "non-assignable except with the consent of PPG first obtained in writing." *Id.* at 1092. The District Court agreed with this claim finding that because the merger occurred by "operation of law" there was no assignment or transfer within the meaning of the "anti-assignment" clause. *Id.* at 1093. The merger at issue in *PPG* was consummated, in part, under the same Delaware merger law that controlled the merger in the case at bar.

On appeal the Sixth Circuit reversed the District Court. In doing so, the court first relied on an interpretation of the Delaware merger law and its effect on property interests: "In short, the underlying property of the constituent corporation is *transferred* to the resultant corporation upon the carrying out of the consolidation or merger ...." *Koppers Coal & Transportation Co. v. United States*, 107 F.2d 706, 708 (3d Cir. 1939)." *Id.* at 1096 (emphasis by the court). The court then held that since a transfer of interests had occurred, the fact that it had taken place pursuant to law made no difference. "A transfer is no less a transfer because it takes place by operation of law rather than by a particular act of the parties. The merger was effected by the parties and the transfer was a result of their act of merging." *Id.* The court further noted that if the parties had intended an exception in the event of a merger, it would

---

**5.** Numerous cases involving "anti-assignment" clauses in real estate leases have been cited by the defendants, however, those cases are not truly relevant for this analysis because the results in those cases can be attributed, in large part, to distinctions between real and personal property and to the strong public policy against restraining the alienability of land.

  Defendants attempt a similar distinction with regard to plaintiff's reliance on the *PPG* case. First, defendants note both that *PPG* involved the transfer of "patent rights" and that a general policy against the assignability of such rights exists. Second, defendants argue that this general policy provided the underpinnings for the *PPG* decision and that *PPG* is therefore inapplicable to the instant case which is neither a patent case nor possesses a similar underlying policy. Because the instant case does possess a *PPG*-like underlying policy against transfers of interest, *see* n.8 and accompanying text *infra* at 283, this court finds *PPG* to be very relevant to the matter at hand.

have been a simple matter to have so provided in the contract.[6] *Id.* at 1095.

The other line of thought is evidenced by some older decisions in a number of state courts. This line of thought centers its concerns on whether the transfer by operation of law has had any adverse effects upon the party nominally protected by the "anti-assignment" clause.[7] This position was best stated by Justice Traynor speaking for the Supreme Court of California in *Trubowitch v. Riverbank Canning Co.*, 30 Cal.2d 335, 344–45, 182 P.2d 182, 188 (1947):

> [A] provision against assignment in a contract or lease does not preclude a transfer of the rights thereunder by operation of law [citations omitted]; and ... if an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract.

*Accord Ruberoid Co. v. Glassman Construction Co.*, 248 Md. 97, 234 A.2d 875 (1967).

■ The determination of whether the *PPG* or the *Trubowitch* approach should control this case is dispositive of this motion for summary judgment. If the *PPG* approach is adopted no further factual inquiry is necessary and plaintiff should be granted a summary judgment; if the *Trubowitch* approach is adopted then further factual inquiry into plaintiff's alleged adverse effects is necessary and plaintiff's motion for summary judgment should be denied.

For the reasons discussed below, this court finds that on the facts of this case the *PPG* approach controls. First, it must be noted that both parties involved in this dispute are extremely experienced business entities and should be savvy to the importance of accurately drafting contracts.

Second, since the contract at issue did provide for certain exceptions to the prohibitions of Section 21.0, if the parties had intended any other exceptions, then they should have so provided. Third, the practical effect of the merger on the partnership itself must be noted because the District of Columbia Code provides: "No person can become a member of the partnership without the consent of all the partners." D.C. Code § 41–317(g). Since the merger has effectively forced plaintiff to accept a new partner without his consent, it runs counter to the above-noted policy.[8]

■ IV. Defendants' final challenge to plaintiff's motion for summary judgment is a challenge to plaintiff's conduct. Defendants maintain that even if this court finds that the transfer of interests pursuant to the merger constituted a violation of Section 21.0, they are still not liable for the breach because of certain affirmative defenses based on plaintiff's conduct. In particular, the defenses asserted are waiver, estoppel, and laches.

Although the factual predicates for these claims have not been clearly laid out, defendants are entitled to an opportunity to develop further facts and to attempt to prove their defenses at a trial on the merits. Since material issues of fact remain as to these defenses they cannot be disposed of on this motion. Indeed, plaintiff seems to recognize the necessity for further development of these charges and, therefore, requests the court for a grant of partial summary judgment on the breach of contract issue. In light of the foregoing, such a partial grant of summary judgment, with a trial on the affirmative defenses to follow, is appropriate. An appropriate order accompanies this Memorandum Opinion.

---

**6.** This component of the *PPG* court's reasoning has peculiar force in the case at bar because these parties did in fact provide for some exceptions to their "anti-assignment" clause. *See* Section 21.0, *supra* at 1.

**7.** In the present case the plaintiff has alleged that he has been adversely affected by the merger of CIP and PAP.

**8.** Although these statutory rules governing the rights and duties of the partners are "subject to any agreement between them," *see* D.C.Code § 41–317, the instant agreement exhibits no intent to abrogate these rights; in fact, it reveals the opposite intent.