**ORLANDO REGIONAL HEALTHCARE SYSTEM, INC., et al., Plaintiffs,**

v.

**COLUMBIA/HCA HEALTHCARE CORPORATION, et al., Defendants.**

No. 95–165–CIV–ORL–18.

United States District Court, M.D. Florida, Orlando Division.

April 29, 1996.

---

Ronald A. Harbert, Michael A. Paasch, Mateer & Harbert, P.A., Orlando, FL, John T. Cusack, Michael P. Padden, John T. Roache, John J. D'Attomo, Gardner, Carton & Douglas, Chicago, IL, for Orlando Regional Healthcare System, Inc., Orlando Regional South Seminole, Inc.

William F. Duker, Jack G. Stern, Duker & Barrett, New York City, Karen C. Dyer, Gary K. Harris, Duker & Barrett, Orlando, FL, David Boies, Cravath, Swaine & Moore, New York City, for Columbia/HCA Healthcare Corporation.

Robert R. Vawter, Jr., Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tampa, FL, Daniel C. Johnson, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Orlando, FL, for Healthtrust, Inc.— The Hospital Co., South Seminole Hospital, Inc.

## ORDER

G. KENDALL SHARP, District Judge.

This action was tried before the court from February 27 to March 7, 1996. Plaintiffs, Orlando Regional Healthcare System, Inc. (ORHS) and its wholly-owned subsidiary, Orlando Regional South Seminole, Inc. (ORSS), sued Defendants alleging violations of the federal antitrust laws and breach of a joint venture agreement. The joint venture agreement (Agreement) governed the relationship between ORHS and Defendant HealthTrust, Inc. (HTI) in their 50/50 partnership owning and operating South Seminole Hospital in Longwood, Florida (South Seminole). In April 1995, Defendant Columbia/HCA Healthcare Corporation (Columbia) merged with HTI, and ORHS brought this action alleging that Columbia's subsequent control over HTI represents a breach of two sections of the Agreement and violates federal antitrust laws governing monopolization. ORHS also alleged that Columbia tortiously interfered with ORHS's contractual relationship with HTI. HTI and its wholly-owned subsidiary, South Seminole Hospital, Inc. (SSHI), filed a counterclaim demanding a dissolution of the partnership based on ORHS's inability to work with HTI's new corporate parent. At the close of Plaintiffs'

case the court granted a directed verdict in favor of Columbia with regard to ORHS's antitrust and tortious interference claims because ORHS failed to present evidence sufficient to support their claims. The court also granted a directed verdict with regard to HTI's counterclaim. As to ORHS's contract claims, the court concludes that HTI breached section 7.1(g) of the Agreement in its merger with Columbia, and that ORHS is entitled to purchase HTI's interest in South Seminole for a value specified in that provision.

## I. Findings of Fact

ORHS and Columbia are strong competitors in the market for acute-care hospital services in the greater Orlando area. The Florida Hospital chain, run by Adventist Health Systems, Inc., also provides a highly competitive alternative for consumers of acute-care services in the area including Orange, Osceola and Seminole Counties. Although the court does not reach the question of what is the appropriate geographic market for purposes of the antitrust laws, it is apparent from the testimony that each of the three competitors consider the three-county area to be a single market. Because of the changing nature of the health care industry, and in particular the challenges presented to hospitals by managed care companies, both Columbia and ORHS want to maintain a presence in all areas of the geographic market.

In addition to its main facility in downtown Orlando, in 1991 ORHS owned hospitals in St. Cloud and in southwest Orange County. However, ORHS did not own a hospital north of State Road 50, a major artery bisecting Orlando. Much of the residential growth in the greater Orlando area in the last several years has occurred north of Orlando, particularly in Seminole County, and ORHS believed it needed to establish a presence in that area to serve the needs of the community. This perceived gap in ORHS's coverage of the three-county area has been exacerbated by the proliferation of managed care companies who demand integrated hospital systems when contracting with health care providers. Managed care companies in

the three-county area contract with employers and individuals throughout the area for health services and prefer to associate with chains of hospitals that can cover the entire area. Those hospital chains with comprehensive geographic coverage therefore have a substantial competitive advantage over stand-alone hospitals or hospital networks with limited coverage.

### A. The South Seminole Joint Venture

This need to create a geographically comprehensive hospital system was the motivation for ORHS's joint venture with HTI in owning and operating South Seminole, a general acute care hospital with 126 beds.[1] Though HTI owned 117 hospitals, primarily in Texas and Florida, South Seminole was the only HTI hospital in the three-county area. ORHS initially had hoped to purchase South Seminole outright from HTI but the two parties could not agree on a price. After those negotiations failed, ORHS and HTI agreed on a joint venture in which South Seminole would become affiliated with ORHS's other hospitals in the area. Both parties believed they could benefit by adding to the ORHS network that with the addition of South Seminole would cover the three-county area almost completely. Pursuant to the Agreement signed by ORHS and HTI in November 1992, ORHS purchased a fifty percent interest in South Seminole for approximately $27.5 million. The purchase price included $24 million for the existing plant, property and equipment, $1.5 million for additions to South Seminole's obstetrics/gynecology unit, and $2 million in working capital. HTI formed SSHI which became the direct owner of HTI's interest in South Seminole. ORHS formed ORSS, which owned directly ORHS's interest in the hospital.

Included in the Agreement are two provisions that provide the foundation for this action. ORHS and HTI included in their contract an opportunity to terminate the joint venture if either party sold their interest in the venture, so that each party could refuse to operate South Seminole with a

---

1. As joint venturers ORHS and HTI also purchased an eighty-bed psychiatric hospital adjacent to South Seminole that is now considered part of the South Seminole facility.

stranger to the Agreement. Section 7.1 provides:

> [N]o direct or indirect owner of an Interest in the Venture may Transfer ... all or any part of his or its direct or indirect Interest in the Venture unless such first offers to sell such Interest to the other Venturer pursuant to the terms of this Section 7.1, and any attempt to so Transfer ... any such Interest in the Venture in violation of the provisions of this Article VII shall be null and void *ab initio.* "Transfer" of an Interest in the Venture shall mean the sale, transfer, assignment or other disposition ... of all or any part of an Interest in the Venture.

The parties included another provision in the contract that provided ORHS a way to purchase South Seminole outright in the event HTI merged with certain specified companies in addition to the general application of section 7.1. Section 7.1(g) states:

> Notwithstanding anything herein to the contrary, in the event HTI has received a Purchase Offer from Humana, Inc., Kaiser Foundation Health Plan, Inc., Adventist Health Systems, Inc., Prudential Insurance Company of America or the Affiliates of any of them, then ORSS or its Affiliates shall be entitled to purchase HTI's interest in the Venture....

The parties defined "Affiliate" as "each person who is, directly or indirectly, controlled by, in control of, or under common control with such Venturer. Control of a Person means the power to direct the affairs of such Person by reason of ownership of voting stock, contract, or otherwise." Agreement at 1.1(c). The Agreement then created a mechanism by which the parties could determine the price ORHS would have to pay for HTI's interest in South Seminole in that event.

Despite the partners' attempt to position South Seminole to benefit from being part of the ORHS system, many managed care plans bypassed South Seminole in crafting delivery networks for their members. Steven Grimm, chief executive at South Seminole, testified that major insurers terminated their relationships with South Seminole because they still regarded it as a stand-alone facility. Specifically, Blue Cross and PruCare did not include South Seminole among their lists of providers while ORHS was running the hospital with HTI, even though both Blue Cross and PruCare contracted with ORHS. As a result of this inability to secure managed care contracts, South Seminole's financial health deteriorated. ORHS believed that HTI's continuing involvement with South Seminole presented a barrier to further integration and in the middle of 1994 ORHS sought to purchase HTI's remaining interest in South Seminole. ORHS hoped to fully integrate the hospital into ORHS's network by completing its purchase of the hospital.

## B. Columbia's Emergence in the Orlando Market

Richard L. Scott formed Columbia in 1988 and the company acquired two hospitals in El Paso on July 1, 1988. Columbia began to purchase hospitals in Florida in late 1988, but in February 1992, when ORHS and HTI signed their preorganization agreement, Columbia's only Florida hospitals were in Dade and Broward Counties. Columbia's acquisition of hospitals nationwide accelerated in the summer of 1992 when it purchased Basic American Medical, Inc. (BAMI). By acquiring BAMI Columbia obtained hospitals in Ft. Myers, Florida and in Port Charlotte, Florida, as well as Kissimmee Memorial Hospital in Osceola County. Columbia had a total of twenty-two hospitals on June 10, 1993, when it entered into an agreement to merge with Galen Healthcare, Inc. (Galen).

Galen was the product of Humana, Inc.'s (Humana's) split of assets on March 1, 1993, into separate health plan and hospital businesses. Humana shifted its hospitals and hospital-related assets to Galen while retaining its managed care and insurance businesses. Through this split Galen assumed control over the bulk of Humana's former assets. Before the separation the hospital business had generated nearly sixty percent of Humana's income and most of Humana's profits. Humana issued shares of the newly formed Galen to its shareholders in the form of dividends, so that on March 1 Humana shareholders had one share of Galen stock for every share of Humana stock. Galen became a separate corporation with a differ-

ent board of directors and different officers from Humana. Galen's stock was publicly traded so that after March 1, 1993, Humana's shareholders were different from Galen's shareholders. As part of this split Galen assumed control over Osceola Regional Hospital in Kissimmee Lucerne Medical Center in downtown Orlando, two hospitals formerly under Humana's control.

Columbia then acquired Galen, with Galen shareholders receiving 0.775 shares of Columbia stock for every share of Galen stock. Though the transaction resulted in Galen becoming a completely-owned subsidiary of Columbia, Galen was substantially larger than Columbia at the time of the merger. Galen owned seventy-three hospitals, more than three times as many as Columbia, and generated four times as much revenue. Six of the eleven directors of Columbia after the merger came from Galen, as did the chairman of the combined board. As a condition of the merger, Columbia moved their corporate offices from Ft. Worth to Galen's offices in Louisville.

The FTC required Columbia to divest Kissimmee Memorial Hospital as part of the Galen transaction. In a separate transaction, though, Columbia acquired Central Florida Regional Hospital in Sanford, Florida, to the north of South Seminole in Seminole County. Columbia also has since purchased fifty percent of Winter Park Medical Hospital and has a contract to manage that hospital. With these hospitals, Columbia owns or controls four hospitals in the three-county area including two reasonably close to South Seminole. Columbia has made clear its desire to purchase ORHS's interest in South Seminole and control that hospital as well.

## C. The Columbia/HTI Merger

On October 4, 1994, Columbia announced their merger with HTI after which Columbia would assume control of HTI's 117 hospitals. In a letter dated November 3, 1994, ORHS took the position that the merger represented a transfer of HTI's interest in South Seminole pursuant to section 7.1 of the Agreement and therefore demanded an offer notice as defined in section 7.1(b). ORHS also claimed that Columbia was an affiliate of

Humana because of Columbia's merger with Galen and thus section 7.1(g) required HTI to offer its interest to ORHS. George M. Garrett (Garrett), Director of Development at HTI and HTI's primary negotiator of the Agreement, initially agreed with ORSH's position. Garrett wrote a letter on December 12 to "acknowledge the restriction rights which ORHS has on the transferability of [HTI's] venture interest in the HTI/ORHS South Seminole Joint Venture. Specifically, Article VII of the joint venture agreement does apply in the event that [HTI] is acquired by Columbia/HCA." Garrett then declared that HTI would negotiate in good faith to sell ORHS its interest in South Seminole by February 28, 1995.

Garrett testified at trial that he had spoken with Bill Carpenter, a partner at the Nashville law firm Waller Lansden Dortch & Davis, about the applicability of the two provisions to Columbia's merger with HTI. Carpenter had been involved in drafting the South Seminole joint venture agreement. Garrett wrote in a subsequent memorandum that Carpenter had told Garrett that the provisions did apply to this situation because Columbia is an affiliate of Humana as defined in the Agreement. Garrett testified at trial that he now believes that Article VII does not apply to the Columbia/HTI merger as he was told by a Columbia attorney. There was no evidence presented at trial to suggest that Garrett or any other HTI executive believed that Sections 7.1 and 7.1(g) did not apply to Columbia's merger until Columbia's lawyers told them their interpretation of the joint venture agreement.

Despite HTI's agreement in December that they had to sell South Seminole to ORHS, the parties could not agree on a price for HTI's interest in the hospital. Karl Hodges (Hodges), ORHS's Chief Financial Officer, offered approximately $16 million on behalf of ORHS. Hodges testified that he believed HTI's interest was worth less than that, but that he was making a generous offer to complete the deal before Columbia's merger with HTI closed. HTI did not agree with Hodges as to the value of its interest. HTI was willing to sell its interest for $27.6 million. The two parties were so far apart

because they used completely different valuation methodologies, a problem that continues to plague everyone involved in this case.

When it became clear that they would not be able to agree quickly on a price, Hodges informed Garrett that ORHS had retained Gardner, Carton & Douglas, a Chicago law firm with an emphasis in antitrust work, to protect its rights under the Agreement. The implication in ORHS's retention of an antitrust law firm was made clear on January 25, 1995, when Hodges informed HTI in a letter that ORHS would seek to enjoin HTI's merger with Columbia if the parties could not agree on a price for South Seminole. After more negotiations, HTI responded that it could not accept ORHS's offer and presented three different methods of valuation to ORHS that produced values of HTI's interest ranging from $23.7 million to $54.2 million.

ORHS then filed this suit on February 21, 1995, against Columbia, HTI and SSHI. ORHS alleged that HTI and SSHI violated the Agreement by not complying with Article VII. ORHS also claimed that Columbia's proposed merger with HTI would violate the federal antitrust laws by giving Columbia a monopolistic position in the state of Florida and in Seminole County, Florida. Finally, ORHS alleged that Columbia tortiously interfered with HTI's contractual relationship with ORHS by inducing HTI to continue with the merger agreement. ORHS sought an injunction preventing the merger and also sought specific performance on the Agreement to purchase HTI's interest in South Seminole. The day before the court's hearing on ORHS's motion for preliminary injunction, Columbia made an offer to ORHS either to buy ORHS's interest or to sell HTI's interest for $30 million. ORHS has refused the offer, and ORHS's lead trial attorney stated that ORHS would not sell its interest in South Seminole to Columbia for $100 million. After the hearing, the court denied ORHS's motion for a preliminary injunction preventing the merger. On April 14, however, the court granted a temporary injunction pending ORHS's appeal of the court's denial of their motion for injunction. The April 14 order only prevented Columbia

from co-managing the South Seminole joint venture with ORHS.

The Federal Trade Commission (FTC) also evaluated Columbia's merger with HTI and issued an order requiring Columbia to take certain steps to diminish the merger's anticompetitive effect. With regard to South Seminole, the FTC required Columbia through its wholly-owned subsidiary HTI to terminate the joint venture with ORHS "by either acquiring ORHS's interest in the [South Seminole] Joint Venture or by divesting the [South Seminole] Joint Venture Interest." The FTC stated that it was requiring Columbia to take this action to ensure that South Seminole would continue to be a viable hospital and to limit the merger's anticompetitive effect. The FTC also stated that Columbia could terminate the joint venture by purchasing ORHS's interest "only in such a manner as receives the prior approval of the [FTC]."

The FTC also ordered Columbia to hold separate HTI's interest in South Seminole until the termination of the joint venture so as to ensure the "complete independence and viability" of South Seminole and to "assure that no competitive information is exchanged between [Columbia] and the managers of [South Seminole]." The FTC order prevents Columbia from exercising direction or control over South Seminole's operation or from influencing South Seminole's affairs, or from gaining access to any confidential information about South Seminole not in the public domain. Grimm testified that no one from HTI or Columbia has been involved in directing the operations of South Seminole for the past year. In order to comply with the FTC order to hold separate HTI's interest in South Seminole, Columbia formed Coltree Corporation and caused HTI to transfer its interest in South Seminole to that entity.

## II. Conclusions of Law

At the close of ORHS's case the court considered Columbia's motion for directed verdict pursuant to Federal Rule of Civil Procedure 50(a)(1) in which Columbia stated that ORHS had failed to state a prima facie case for its antitrust claims. The court granted Columbia's motion because the court concluded that ORHS was asserting its anti-

trust claim based on speculative findings assuming Columbia acquired South Seminole. ORHS had made clear in its case, however, that it had no intention of selling its interest in South Seminole and that therefore there was no manner in which Columbia could gain control over South Seminole. As Columbia's counsel pointed out, in its complaint ORHS based its antitrust claim on the effect of Columbia's merger with HTI. Because of ORHS's position and the ruling made by the FTC that requires Columbia to terminate the joint venture, it is apparent to the court that Columbia's merger with HTI by itself cannot create the anticompetitive effect alleged by ORHS. Someone might have an antitrust claim if ORHS were to sell its interest in South Seminole to Columbia, but such a claim is inappropriate under these facts.

The court also granted ORHS's motion for directed verdict on HTI's counterclaim. In fact, if the court had ruled in favor of HTI on its counterclaim against ORHS the anticompetitive effect ORHS alleged in the complaint might have become legitimate. HTI had asked the court to dissolve the joint venture because through its actions ORHS had made the continuing vitality of the joint venture untenable as a business enterprise. The FTC required Columbia to terminate the joint venture in accepting Columbia's merger with HTI, so HTI's claim is moot. In effect, HTI was asking the court to auction off ORHS's interest in South Seminole in an effort to end the acrimonious negotiations for the sale of HTI's interest in the hospital and allow Columbia, with its vastly greater resources, to outbid ORHS for ORHS's share.

Therefore, only ORHS's contract claims against HTI remain. ORHS argues that HTI breached the joint venture agreement in one of two ways. First, ORHS claims that HTI transferred its interest in the joint venture to Columbia when HTI and Columbia merged without HTI first offering its interest in South Seminole to ORHS, in violation of section 7.1 of the Agreement. If the court finds that HTI did not transfer its interest, ORHS urges the court to find that HTI breached section 7.1(g) of the Agreement by not offering ORHS its share of South Seminole when Columbia acquired HTI. ORHS argues that Columbia is an affiliate of Humana, one of the specified parties in section 7.1(g). The court will evaluate the parties' arguments under section 7.1 and section 7.1(g) separately.

## A. Section 7.1

ORHS contends that HTI violated this section of the Agreement because Columbia's merger with HTI represented a transfer of HTI's interest in South Seminole, triggering a right of first refusal to ORHS with which HTI did not comply. HTI does not dispute that Columbia has business control over HTI, but argues that a change in the ownership of HTI's stock did not effect a transfer of HTI's interest. HTI asserts that it remains a viable corporation still possessing an indirect ownership interest in South Seminole (with SSHI retaining the direct ownership interest in the hospital). In support of its position HTI cites a number of cases from the Fifth Circuit Court of Appeals deriving from that Circuit's opinion in *Engel v. Teleprompter Corp.*, 703 F.2d 127 (5th Cir.1983).

In *Engel*, the court confronted a corporation, Cooke, Inc. (Cooke) that contracted with other parties to obtain a cable television franchise in El Paso, Texas. In their stock subscription agreement, the parties agreed "that in the event that any of the stockholders propose to sell or otherwise dispose" of their share in the franchise, the remaining parties would have a right of first refusal to purchase that share. *Id.* at 128 (quoting agreement). At the time of the agreement Cooke was a wholly-owned subsidiary of H & B American Corporation (H & B), but two years after the agreement H & B merged with Teleprompter Corporation (Teleprompter), with Teleprompter as the surviving entity. Afterward, Westinghouse Electric Corporation (Westinghouse) purchased Teleprompter's stock and Teleprompter became a wholly-owned subsidiary of Westinghouse though still a viable corporate entity. Cooke, though renamed in the H & B/Teleprompter transaction, also remained a viable corporation though it was a wholly-owned subsidiary of both Teleprompter and Westinghouse.

The other parties to the El Paso stock subscription agreement argued that Westinghouse's purchase of Teleprompter's stock and its assumption of business control over Teleprompter and Cooke triggered their right of first refusal. The Fifth Circuit rejected that proposition, basing its decision on its interpretation of Texas law governing the sanctity of the corporate form. The court noted that "[i]n a merger, both the assets and liabilities of the disappearing corporation are vested in the surviving corporation," but a stock acquisition "does not constitute the purchase of the corporate assets, just as a transfer of the stock of a corporation is not a transfer of the property and assets of the corporation itself." *Id.* at 131. A subsidiary corporation remains "a legal entity separate and apart from its shareholders, notwithstanding the fact that its principal shareholder is another corporation." *Id.*

The court in *Engel* therefore concluded that Westinghouse's purchase of Teleprompter's stock did not trigger the right of first refusal because Cooke retained its shares in the El Paso franchise throughout. In order to find that a change in the ownership of Cooke's stock in turn changes the ownership of Cooke's assets, a court must pierce the veil of the corporation. As the court noted, "A parent corporation possesses a separate existence and is treated separately from a subsidiary unless there are circumstances justifying disregard of the corporate entity." *Id.* at 134. Otherwise courts must respect the legal fiction of a corporation formally retaining control of its assets regardless of changes in ownership of the corporation's shares. Finding no such exceptional circumstances, the court concluded that Cooke had not transferred its interest in the El Paso venture and therefore had not triggered the right of first refusal clause.

Similarly, in *Capital Parks, Inc. v. Southeastern Advertising and Sales Sys., Inc.*, 30 F.3d 627 (5th Cir.1994), one corporation (Southeastern) gave another (Capital) a right of first refusal with respect to the purchase of capital stock and assets of one of Southeastern's wholly-owned subsidiaries. When another party acquired Southeastern's stock Capital sought to enforce its right of first refusal. Recognizing that the subsidiary was distinct from the parent corporation with separate assets and liabilities, the court concluded that a transfer of Southeastern's stock did not represent a transfer of the subsidiary's assets. *Id.* at 629. The only way a parent's stock transfer could be considered a transfer of the subsidiary's assets would be through disregarding the corporate form and piercing the corporate veil. Because no extraordinary circumstances appeared from the facts of the case, the court declined to do so and refused to enforce Capital's right of first refusal. *Id.* at 630.

Both of these cases depend upon Texas's respect for the corporate form; there are three circumstances when Texas law justifies piercing the corporate veil: "1) when the corporation is the alter ego of its owners or shareholders; 2) when the corporation is used for illegal purposes; and 3) when the corporation is used as sham to perpetrate a fraud." *Capital Parks, supra,* 30 F.3d at 629 (citing *Villar v. Crowley Maritime Corp.,* 990 F.2d 1489, 1496 (5th Cir.1993)). Florida, whose law the court must apply in this case, similarly protects the integrity of the corporation unless there are unusual circumstances. The Florida Supreme Court has noted, "The corporate entity is an accepted, well used and highly regarded form of organization in the economic life of our state and nation." *Dania Jai-Alai Palace, Inc. v. Sykes,* 450 So.2d 1114, 1120 (Fla.1984) (quoting *Roberts' Fish Farm v. Spencer,* 153 So.2d 718, 721 (Fla.1963)). For this reason, Florida courts may pierce the corporate veil only upon a showing "that the parent corporation used the subsidiary as a mere instrumentality and that this was done for an improper purpose." *Reflectone, Inc. v. Farrand Optical Co., Inc.,* 862 F.2d 841, 845 (11th Cir. 1989). In explaining this standard, the Florida Supreme Court in *Dania* quoted an earlier case which held, "It isn't sufficient merely to show that the corporation exists and that there are a limited number of stockholders doing business in good faith through the corporate entity.... The corporate veil will not be penetrated either at law or in equity unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud upon them." *Id.* at 1120

(quoting *Advertects, Inc. v. Sawyer Industries, Inc.*, 84 So.2d 21, 23–24 (Fla.1955)).

ORHS argues that the court need not pierce HTI's corporate veil to conclude that a transfer of interest has taken place. The cases that ORHS cites in support of its contention, however, are all distinguishable from this case because of crucial differences in the contractual language providing the rights of first refusal or in the corporate structures involved. For example, in *PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090 (6th Cir.), *cert. denied,* 444 U.S. 930, 100 S.Ct. 272, 62 L.Ed.2d 187 (1979), the Sixth Circuit considered the effect on certain patent licenses granted to a corporation that later merged with a larger corporation and terminated its separate corporate identity. The court held that the merger terminated the licenses, but based its opinion on the principle that "agreements granting patent licenses are personal and not assignable unless expressly made so." *PPG,* 597 F.2d at 1093. There is no such principle at work in this case. Also, the corporation to which the licenses were granted lost its separate identity when it merged, and therefore there was no continuity of ownership of those licenses on a corporate level.

Similarly, in *Nicolas M. Salgo Assoc. v. Continental Illinois Prop.*, 532 F.Supp. 279 (D.D.C.1981), the court considered a partnership agreement between two corporations that prohibited either partner from selling or assigning their interest without approval from the other partner. One of the partners later merged into another corporation and its separate corporate identity was terminated. The court determined that the merger represented a breach of the partnership agreement because the property was transferred to the resultant corporation and that corporation assumed the rights and duties of the original partner. *Id.* at 282–83 (citing *PPG* ). Again, unlike the case before the court, the corporation who contracted did not continuously maintain the interest because it lost its individual corporate identity through the merger.

ORHS also presented to the court an Oregon precedent with facts similar to this case involving a partnership among different cellular telephone service providers. *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Ltd. Partnership,* 840 F.Supp. 770 (D.Or.1993), *aff'd in part, rev'd in part,* 76 F.3d 1003 (9th Cir.1996). In this partnership, three competing "families" of cellular telephone companies had equal shares in the venture with a right of first refusal if a venturer wished to transfer its interest to an entity outside its family. The court determined that the parties negotiated this provision to protect the partnership from becoming dominated by one family. *Id.* at 775. To get around this clause, one family arranged to sell the wholly-owned subsidiary, whose assets consisted solely of the partnership interest, to another family. This party hoped to evade the reach of the right of first refusal by selling the entire subsidiary instead of the subsidiary's interest in the venture. Recognizing that this "artifice" violated the spirit of the contract, the court held that the transaction represented a breach of contract based on an implied covenant of good faith and fair dealing under Oregon law. *Id.* at 776.

The court's holding in *Oregon RSA* is controlling. The wholly-owned subsidiary that was transferred in that case only existed for the purposes of the partnership; its only asset was the partnership interest. A direct analogy to this case might have involved HTI selling SSHI to Columbia, because SSHI similarly was created solely for the South Seminole joint venture. The court in *Oregon RSA* implicitly acknowledged that the subsidiary was an alter ego of its stockholders—the family—and therefore the court could ignore the subsidiary's separate corporate existence.

The court concludes that it must find similarly extraordinary circumstances for the court to disregard the corporate structure of HTI and SSHI in this case. The transaction through which Columbia acquired control over HTI did not terminate HTI's existence as a viable corporation. Before the merger HTI had been a publicly traded corporation, owned by thousands of shareholders. After the stock acquisition Columbia became the sole owner of HTI and its subsidiaries, and a subsidiary of Columbia merged into HTI. HTI was the surviving entity in that merger, however, and HTI's corporate structure did

not change as a result of the merger. Therefore, HTI retained its official ownership of its interest in South Seminole even as the merger altered HTI's stock ownership.

The court cannot find that Columbia has maintained HTI's corporate identity to perpetrate a fraud, to mislead creditors or otherwise misuse the corporate form. ORHS presented no evidence that Columbia's maintenance of HTI and SSHI and separate corporate entities was part of some dark plot to evade the provisions of section 7.1; rather Columbia's actions in this merger appear to be consistent with its *modus operandi* in previous acquisitions. To pierce the corporate veil under Florida law requires proof of some intent to mislead through use of the corporate form; there is no suggestion of such an intent in this case. While maintaining HTI may be self-serving for Columbia in this case, that does not provide sufficient cause to ignore HTI's continuing status as the owner of its interest in South Seminole.[2] For these reasons, the court concludes that no transfer has taken place under the language of section 7.1, and that ORHS's right of first refusal under that provision has not been triggered.

### B. Section 7.1(g)

■ In contrast to section 7.1 of the Agreement, which bound both HTI and ORHS, section 7.1(g) binds only HTI in the event the corporation receives a purchase offer from one of four enumerated parties or those parties' affiliates. The agreement specifically defines "affiliate" as "each Person who is, directly or indirectly, controlled by, in control of, or under common control" of the party. Control is defined as "the power to direct the affairs of such Person by reason of ownership of voting stock, contract, or otherwise." HTI does not dispute that Columbia made a purchase offer for the corporation in October 1994 in the form of a stock acquisition, and the question for the court is whether Columbia is an affiliate of one of the four parties enumerated in section 7.1(g). Specifically, ORHS alleges that Columbia is an

affiliate of Humana through Columbia's merger with Galen in September 1993.

As noted in the court's findings of fact, Galen was formed when Humana split its health plan business from its hospital business in February 1993. Upon its formation Galen inherited most of Humana's revenue-generating assets, including Humana's two hospitals in the Orlando area. After Galen's creation Humana still existed as a corporation and under the definition given in the Agreement Galen was not an "affiliate" of Humana when Columbia merged with it. As a result of their merger, however, Columbia is an affiliate of Galen. If Galen can be substituted for Humana under section 7.1(g), Columbia's acquisition of HTI would trigger ORHS's right of first refusal. The narrowly defined question before the court, therefore, is whether Galen should be considered as Humana under section 7.1(g).

■ In interpreting a contract the court looks not only to "face of the instrument, but also [to] the situation of the parties and the nature and object of their transactions." *Tampa Fed. Sav. and Loan Ass'n v. Aeon, Inc.,* 403 So.2d 1002, 1004 (Fla.Dist.Ct.App. 1981) (citations omitted); *see also Bay Management, Inc. v. Beau Monde, Inc.,* 366 So.2d 788, 791 (Fla.Dist.Ct.App.1978) ("In construing a contract the court must consider the objects to be accomplished, and to this end should place itself in the position of the parties when the contract was entered into."). Florida courts have made clear that a "reasonable interpretation of a contract is preferred to an unreasonable one," and that "[e]very provision in a contract should be given meaning and effect." *Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So.2d 938, 941 (Fla.1979); *accord Jacksonville Branch, NAACP v. Duval County Sch. Bd.,* 978 F.2d 1574, 1582 (11th Cir.1992); *Stinson, Lyons, Gerlin & Bustamante, P.A. v. Brickell Bldg. 1 Holding Co.,* 923 F.2d 810, 813 (11th Cir.1991).

**2.** The court rejects ORHS's contention that Columbia's transfer through HTI of HTI's interest to Coltree Corporation triggers section 7.1. ORHS's claim focuses on a breach of contract by

Columbia's acquisition of HTI; HTI's temporary transfer of its interest in order to satisfy the FTC's order is irrelevant for purposes of this discussion.

The court therefore must construe section 7.1(g) in a manner that contemplates the circumstances in which ORHS and HTI contracted. South Seminole was HTI's only hospital in the area; ORHS therefore did not perceive HTI to be a serious competitor for ORHS's market position. At the time they signed the joint venture agreement in 1992, Humana, which owned two hospitals in the three-county area, and Adventist Health Systems, which owns the Florida Hospital chain, were the two major competitors to ORHS in the acute-care hospital market. Kaiser and Prudential were large health care companies who contracted with ORHS for health care services regularly. It is evident that ORHS negotiated section 7.1(g) so that it would not have to be a partner in the South Seminole joint venture with one of its competitors in the Orlando area, and that ORHS considered the four enumerated companies to be the most serious threats to its competitive position. Recognizing the fluid nature of the health care industry, ORHS inserted this provision into the Agreement to protect itself in the event that HTI allied itself with one of these competitors even while maintaining corporate ownership of its interest in South Seminole.

Taking ORHS's rationale for including section 7.1(g) into account, the court accepts ORHS's position that both Galen and Humana were burdened by this provision after Galen's formation as a separate corporation. When Galen took corporate control of Humana's hospitals in the three-county area, Galen immediately assumed Humana's former position as one of the three dominant competitors in Orlando's acute-care hospital market. ORHS's concern as reflected in the Agreement about working with Humana because of its competitive position became concern about working with Galen when Humana transferred its assets to Galen. While the court respects the legal importance of the corporate form, see supra Section II.A, the court cannot accept the formalistic determination that section 7.1(g) applies only to Humana after that corporation split itself into two corporations and Galen assumed Humana's competitive position. From ORHS's and HTI's position, the important sector of Humana merely changed its name to Galen.

Accordingly, the court concludes that Galen should be considered among the companies set forth in section 7.1(g), and that Columbia, as an affiliate of Galen, triggered that provision when it acquired HTI.

██ Finally, the court notes that ORHS placed great importance at trial on George Garrett's statements as to the applicability of section 7.1(g). Garrett, who was HTI's primary negotiator for the joint venture agreement, wrote a letter to ORHS agreeing that section 7.1(g) applied to Columbia's acquisition of HTI. Garrett also testified that Bill Carpenter, an attorney representing HTI in drafting the joint venture agreement, agreed with this interpretation of the contract. Interpretation of the contract is a legal function reserved for the court, and neither Garrett's nor Carpenter's perceptions are determinative. See DEC Elec., Inc. v. Raphael Constr. Corp., 558 So.2d 427, 428 (Fla.1990). However, Garrett's and Carpenter's initial views on the subject provide additional support for the court's conclusion that the parties intended section 7.1(g) to apply to the situation where Columbia allied itself with one of ORHS's competitors enumerated in the contract. See Oakwood Hills Co. v. Horacio Toledo, Inc., 599 So.2d 1374, 1376 (Fla.Dist.Ct.App.1992) (acknowledging that courts may look to the parties' actions to determine their intent).

## C. Valuation

Section 7.1(g) provides a formula to be used in setting a value in the event HTI receives a purchase offer from certain ORHS competitors. Because the court finds that Columbia's acquisition of HTI triggers section 7.1(g), the court will apply that provision in determining a value for HTI's interest in South Seminole. ORHS is

> entitled to purchase HTI's interest in the Venture for a purchase price equal to the lesser of (x) the Offer Price and (y) the greater of (i) 110% of appraised fair market value of the Venture Assets multiplied by a percentage equal to HTI's Venture Percentage at the time of transfer and (ii) an amount equal to the average EBDIT of the Venture for the three most recently completed fiscal years of the Venture de-

termined from the audited financial statements of the Venture for such years ... multiplied by a percentage equal to HTI's Venture Percentage at the time of transfer.

Agreement at section 7.1(g). With regard to subpart (y)(ii), EBDIT is then defined as "net income of the Venture as reflected on the audited financial statements of the Venture *plus* depreciation, amortization, interest expenses and income taxes deducted in determining the net income of the Venture." *Id.* (emphasis in original). The parties define "Venture Percentage" as

> a fraction, stated as a percentage, with a numerator equal to the value on the date made of such Venturer's capital contributions (including assets transferred by such Venturer) to the Venture less distributions received by such Venturer pursuant to Section 5.1 and a denominator equal to the value on the date made of all capital contributions (including assets transferred to the Venture) less all distributions made pursuant to Section 5.1. Initially each Venturer's Venture Percentage shall be 50%.

*Id.* at section 1.1(cc). The court received no evidence indicating that either party's Venture Percentage had changed from fifty percent, and the court therefore determines that HTI maintained a Venture Percentage of fifty percent for its purposes.

The testimony offered by the parties indicates that there is a wide range of possible values for HTI's interest in South Seminole, from ORHS's estimate of approximately $8 million to George Garrett's estimate of $54 million. The parties arrived at such disparate values primarily by manipulating the figure by which they multiply the EBDIT values to represent the future earning potential of the hospital.[3] Essentially, hospital evaluators utilize high or low multiples depending on how optimistic or pessimistic they are about the future earnings of a hospital relative to the current earnings of the hospital. Put another way, evaluators use a high multiple when they believe future earnings

will be considerably higher than current EBDIT, and use a lower multiple when they find that earnings will be lower or remain fairly constant. The testimony by the parties' valuation experts at trial revealed that there is little consensus as to an appropriate multiple for South Seminole.

The valuation provision in section 7.1(g) contains three possible amounts for ORHS's purchase of HTI's interest in the hospital: (1) the price Columbia paid for HTI's interest in the hospital; (2) 110 percent of the appraised fair market value; or (3) the amount derived from the average EBDIT multiplied by HTI's percentage interest in the venture. Given the amount of testimony concerning a proper multiple to use in valuing South Seminole, the court is surprised by the absence of a multiple in valuing the hospital under the third method. The court assumes the parties intended this provision to create a baseline figure using an implied multiple of one. As for that figure, the EBDIT for South Seminole for the year ending August 31, 1993 was $5,895,397; for the year ending August 31, 1994 it was $2,988,233; and for the year ending August 31, 1995 it was approximately $4.7 million. Using the average EBDIT for the previous three years enables the court to avoid resolving an accounting dispute between the parties concerning recapture of Medicare payments; the court will consider the Medicare recapture payments as part of the 1995 EBDIT. The average EBDIT for these three years is $4,527,876; fifty percent of that value is $2,263,938. As for the "offer price" that Columbia paid for HTI's interest in South Seminole, the only evidence the court received was an estimate by Garrett made during HTI's negotiations to sell its interest to ORHS in February 1995. Based broadly on the figures from the system-wide HTI/Columbia merger, Garrett estimated that value to be either $42,977,437 or $54,195,428, depending on whether one considered total net revenues or total assets.

---

**3.** David Colby and David Felsenthal also manipulated the EBDIT values because they were confident that under different management the hospital's earnings would increase substantially. Given the other testimony at trial, the court con-

cludes that optimism about future earnings are typically reflected in the valuation multiple, and the court relies only on the EBDIT values contained in South Seminole's audited financial statements.

**1546**

With regard to the appraised fair market value, the court recognizes the disparity in the appraised values offered by competing experts David Felsenthal and Bruce Den Uyl for HTI's interest in South Seminole. Accordingly, in determining the fair market value the court orders both ORHS and HTI to name an appraiser. These two appraisers will then agree on a third appraiser. Each will then evaluate the worth of HTI's interest in the hospital. The parties will make whatever information the appraiser deems necessary available for his consideration, including access to the facility and any financial records. The court orders these appraisals to be completed and the results reported to the court within ninety (90) days. Based upon the value determined by the appraisers, the court will then establish the value ORHS is to pay HTI for its interest in South Seminole based on the mechanism set forth in section 7.1(g).

### III. Conclusion

The court concludes that HTI breached section 7.1(g) of the Agreement by not offering ORHS the opportunity to purchase HTI's interest in South Seminole when Columbia acquired HTI, because as an affiliate of Galen Columbia was bound by that section. HTI did not breach section 7.1 of the Agreement because it has not transferred its interest in the joint venture. The court withholds its determination of the price ORHS is to pay HTI for HTI's interest under section 7.1(g) until the parties provide appraisals of the fair market value of the hospital. The court orders the parties to complete the appraisals within ninety (90) days from the date of this order.

It is **SO ORDERED.**